**Willie Ralph RAY, to his own use and to the use of Liberty Mutual Insurance Company**

v.

**COMPANIA NAVIERA CONTINENTAL, S.A., a body corporate, Defendant and Third-Party Plaintiff,**

v.

**ROBERT C. HERD & CO., Inc., Third-Party Defendant.**

**Civ. A. No. 11025.**

United States District Court
D. Maryland.

March 27, 1962.

John H. Skeen, Jr., Skeen, Wilson & Coughlin, Baltimore, Md., for defendant and third-party plaintiff.

David R. Owen, Baltimore, Md., for third-party defendant.

R. DORSEY WATKINS, District Judge.

Plaintiff Ray brought suit against defendant Compania Naviera Continental, S.A. to recover damages for injuries sustained while working aboard defendant's vessel, the S.S. Transyork, as a longshoreman in the employ of Robert C. Herd & Company, Inc. Defendant impleaded Robert C. Herd & Company, Inc. (Herd) claiming indemnity. When Ray's case came on for hearing, defendant settled with plaintiff, the third-party complaint being reserved for a later decision. At a subsequent pretrial conference it was agreed by the remaining parties that the issues of liability and damages in the third-party complaint would be separated and that the issue of liability should be heard and determined before the question of the extent of the recovery, if any, was explored.

The S.S. Transyork, a Victory ship built for general cargo and not for the ore trade, arrived in Baltimore loaded with a cargo of ore, and arrangements were made with Herd to discharge her. There was no evidence as to how often she had been used for ore cargoes. In discharging, the ore was removed insofar as practicable by dippers and by bulldozers which were lowered into the holds through the hatch openings. When the operation reached such a point that the material could not effectively be handled by the automatic equipment, gangs of stevedores called "trimmers" were sent into the holds to clean out the corners. The plaintiff, Willie Ray, was a member of such a gang. He had worked as a stevedore for six months and, before and after that, as a seaman. On the date of his accident, February 14, 1958, his gang was sent into hold No. 4 of S.S. Transyork. At about 3 a. m. he was leaving the hold by means of a ladder in the square of the hatch at the after end.

Amos I. Meyers, Baltimore, Md., for plaintiff.

Other stevedores, perhaps as many as eleven, had preceded him. When he reached the 'tween deck a rung of the ladder came loose and he fell to the bottom of the hold sustaining injuries.

There was no written contract between third-party defendant Herd and third-party plaintiff governing the performance of the stevedoring work by said third-party defendant but the relationship between them was of the nature which is governed by the principles set forth in Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp., 1956, 350 U.S. 124, 125, 76 S.Ct. 232, 100 L.Ed. 133 and Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 565, 78 S.Ct. 438, 2 L.Ed.2d 491. At the pretrial conference previously referred to, third-party plaintiff's position as to Herd's liability for indemnity was stated as follows:

"That the third-party defendant Robert Herd and Company is an experienced stevedore of long service in the Port of Baltimore, whose experience includes the loading of ore ships; that the third-party defendant undertook for the third-party plaintiff to unload its vessel of ore; that the vessel was of the type that had two means of ingress and egress to the holds of the vessel, one consisting of steel runged ladders going down in the so called square of the hatch, and another known as a bulkhead ladder going into the same hold against the bulkhead and protected from the known abuse of loading and unloading of bulk ore through the hatch; that as an expert experienced stevedoring company, the Herd Company had a duty in performing its contract for the third-party plaintiff in a proper and workman-like and safe condition to notify and require its stevedore employees to use the known safe means of ingress and egress to the hold, rather than permitting use of a ladder in the open square of the hatch that they knew or should have known was a possible dangerous instrument because of its location in the square of the hatch subject to abuse from the ore being loaded and unloaded and because of the machinery used in such an operation.

"It is the third-party plaintiff's contention that a ladder so located in a vessel of this type being used to carry ore was known in the trade to be in a location where it was so subject to abuse from loading and unloading that it was likely to be a dangerous means of getting into and out of the hold, and that they had a duty to inspect it in fact, and if they did not and it was found out to be in fact dangerous, they were responsible.

"The third-party plaintiff's position is that, where the ship furnished a safe means of access to the hold along with the particular means which the ship contends were known to be risky, if the stevedoring company elected to permit its employees to use the risky ladder and they were hurt, the stevedoring company would be liable to the ship whether or not the ladder was patently or latently defective at the time it was turned over to the stevedoring company or became such thereafter, and that accordingly it would appear that inspection or failure on the part of the stevedoring company to inspect the ladder in question before use would be immaterial on the question of liability."

All the witnesses who testified in the case were called and examined by the third-party plaintiff except plaintiff Ray, who was called by and testified on behalf of Herd. The evidence failed to establish that escape ladders are uniformly or necessarily safer than hatch ladders or that there existed a practice in the trade whereby the supervisory personnel of stevedoring companies required the use of escape ladders and prohibited the use of hatch ladders in ships of this type where the cargo was ore. Perhaps the mere use of the word

"escape" connotes an element of danger and a safety precaution to obviate harm from said danger. The testimony, however, entirely convinced the court that such an implication was unwarranted.

Both escape ladders and hatch ladders are subject to damage by ore and by bulldozers, but when an escape ladder is crushed by a bulldozer it is forced against the bulkhead so that insufficient room is left for the men to get a foothold thereon. Hatch ladders, on the other hand, can be bent considerably without destroying their usefulness or safe condition. While it is true that hatch ladders are more exposed to damage in that they are subject to contact with the grab buckets or other objects being lowered into and lifted out of the hold while escape ladders are not, this is far from proving third-party plaintiff's contention that hatch ladders cannot as a practical matter be maintained in a safe condition in Victory ships carrying ore. Third-party plaintiff's expert witness, Captain Nichols, testified with respect to the escape ladders on the S.S. Transyork that they were protected from damage by a steel shaft. His testimony was discredited by his lack of familiarity with the S.S. Transyork, if not with foreign flag ore bearing carriers in general; by the testimony of Hall, superintendent in charge of repairs for Herd, and of Ray, the injured plaintiff, to the effect that in this case the escape ladder in hold No. 4 was not protected by a steel shaft, there being no shaft at all except at the manholes where the ladder went through the upper decks. The testimony on behalf of the third-party plaintiff regarding the relative damage done to hatch ladders as distinguished from escape ladders was for the most part general in nature, not related to the S.S. Transyork or to the particular loading, discharging or cargo in question. Specifically, the rung which gave way was the first rung above the 'tween deck. Thus, it is highly improbable that it ever came into contact with the ore cargo. Nor was there any explicit evidence of damage to the ladder in question by a bulldozer or by grab buckets being lowered into the No. 4 hold.

Also significant as to relative safety of hatch and escape ladders is the fact that at the time the hatch ladder was used by plaintiff Ray it was night. Hall, and Keve, the injured plaintiff's gang foreman, agreed that escape ladders offer a particular risk at night since they are almost never lighted while hatch ladders are. Moreover, as Keve pointed out, the main deck trunk is commonly used for the storage of ship's gear which creates an additional hazard at the head of an escape ladder at night.

These facts evidence that third-party plaintiff is unwarranted in generalizing that virtually all hatch ladders are defective, whereas escape ladders are not. Even assuming, arguendo, that there is some support and necessity for generalization, third-party plaintiff's case would still fail for lack of proof of the applicability of such generalization to this case. The court is constrained to the conclusion that the third-party plaintiff failed to offer evidence sufficient to sustain its contention that on the S.S. Transyork escape ladders, as a general rule, are safer than hatch ladders. Nor is the evidence more persuasive as to the existence in the trade of a practice whereby supervisory personnel of stevedoring companies require the use of escape ladders and prohibit the use of hatch ladders in Victory ships carrying ore. No proof was offered that it was customary in this port for stevedoring companies to require the use of escape ladders instead of hatch ladders. Indeed no proof was offered that even one stevedoring company followed such a practice. The unequivocal testimony is to the effect that the practice of the men is to use the ladder closest at hand. Keve, when questioned as to which ladder he used, replied "just the ladder that was closest to me at the time that is the ladder I used; unless the ladder had been proven unsafe, or seen that it is unsafe then the men or me won't use them. As long as they look safe and seem safe, the men use them." (Transcript, page 16).

Ray stated that the general practice was to use the ladder closest at hand (Transcript, page 151) and that in descending into hold No. 4 on the night in question, he believed that he used the escape ladder, the reason being that it was the closest one to him as he came out of hold No. 5 where his gang had just finished working. (Transcript, page 146). Hall testified that he almost always used the hatch ladder and that almost all the men that worked for him couldn't get down the escape ladders because they were either heavy men or elderly men. (Transcript, page 52). Escape ladders are so close to the bulkhead that the stevedores have very little room, about five to six inches, for their feet to get a grip on the rungs. On the contrary, hatch ladders are located in the open, in the square of the hatch, thus providing ample space for the trimmers' feet to grasp the rungs firmly.

■■ Of course the practice of the men is not necessarily the test of what constitutes a safe procedure. In this regard, reference to the regulations promulgated by the Department of Labor for stevedoring operations is not without significance although these regulations did not become effective until after the date on which plaintiff Ray was hurt. In fact, third-party plaintiff on page 10 of its trial memorandum states: " * * * those regulations are significant in that they constitute a codification of what was generally recognized in the trade at the time they were adopted as reasonably safe longshoring practice." A pamphlet containing safety and health regulations for longshoring as prepared by the Department of Labor in June 1960 was introduced into evidence as third-party defendant's Exhibit No. 2. Section 9.25 thereof provides in subsection (b) that when *"any* fixed ladder is *visibly unsafe,* the employer shall prohibit its use by employees." (Emphasis supplied). The pamphlet constitutes the "Bible" of the stevedoring industry. Hence the court accepts section 9.25 as defining what is reasonably required in the trade. This conclusion is reinforced by a careful consideration of the rules and regulations for cargo and miscellaneous vessels as established by the United States Coast Guard. Section 92.10 makes it clear that the Coast Guard has never required that only escape ladders be used on ore ships to enter or leave the hold. In view of the Coast Guard's power to require United States shipbuilders, owners or operators to provide better constructed or better protected hatch ladders on ore ships or even to remove such ladders before loading and in view of the fact that the Department of Labor's regulations were drafted only after nationwide hearings and do not provide that hatch ladders should not be used, it seems to this court an impractical, unrealistic and unwarranted assumption that there is, or should be, an implied requirement that a private stevedoring company should prohibit the use of hatch ladders.

■■ Obviously, were a ladder known to be unsafe or could it reasonably be ascertained that it was unsafe, a stevedoring company would be held to have breached its contractual warranty of workmanlike service if it failed to warn of possible danger and to prohibit the use of the unsafe ladder. In the instant case all of the testimony is to the effect that the ladder in question was latently, but only latently, dangerous. Hall testified that the rung in question gave way because of an old break in it (Transcript, page 38); that specifically the rung gave way when Ray's weight was applied to it as it was spot welded at one end and not secured at all at the other end (Transcript, page 53); and that such a condition would not be visible due to the rust on the rung (Transcript, page 53). The injured plaintiff himself testified that he noticed nothing wrong with the ladder and that he certainly would not have used it had he noticed anything wrong. (Transcript, page 148). The testimony of Keve, plaintiff's gang foreman, is exactly the same. (Transcript, page 34). The court concludes that the latent defect in the ladder could not have been detected by

third-party defendant by any kind of visual inspection as a practical matter.

Third-party plaintiff failed to produce any witnesses familiar with stevedoring operations to testify as to what inspections of a ship's appurtenances are customarily made by stevedoring companies in this port and likewise failed to produce any witnesses, expert in the field of ship repairing, welding, or metallurgy to develop what information would have been discovered by inspections of any particular type. Third-party plaintiff failed to show what kind of inspection third-party defendant would have had to make in order to discover the defect. From this the court further concludes that there was no type of inspection reasonable and practicable under the circumstances. Third-party plaintiff after trial and at final argument advanced the novel, if not extreme, theory that the third-party defendant was required to make whatever type of inspection was necessary in order to discover the latent defect. Certainly the shipowner would not only object but would prohibit the dismantling of every piece of ship's gear, such as winches, lights, etc. in a professed effort by the stevedoring company to ascertain whether or not the ship's own appurtenances were seaworthy.

Under these facts the court finds that on the part of Herd there was no knowledge, actual or constructive, of the existence or the possible existence of any unseaworthy condition on the S.S. Transyork; that there was no negligence on the part of Herd and that Herd merely non-negligently brought into play an unseaworthy appurtenance of the ship. The question for decision thus becomes: is Herd nevertheless liable for indemnity over under the principles set out in Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 and the cases construing that decision. The Supreme Court of the United States in Crumady expressly stated that the stevedoring company's *independent act of negligence* in moving the head of the boom was the basis for its liability to indemnify the ship. The court said:

> "We conclude that since the *negligence* of the stevedores, which brought the unseaworthines of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over." (358 U.S. 429, 79 S.Ct. p. 449; emphasis supplied).

In Waterman Steamship Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169, the court said, citing Crumady:

> "The warranty may be breached when the stevedore's *negligence* does no more than call into play the vessel's unseaworthiness." (364 U.S. 423, 81 S.Ct. 201; emphasis supplied).

In at least four opinions the Court of Appeals for the Fourth Circuit has had occasion to construe Crumady. In Smith v. Jugosalvenska Linijska Plovidea, 4 Cir., 1960, 278 F.2d 176, 180, the court stated:

> "Therefore, the court [in Crumady] held that since the *negligence* of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over." (Emphasis supplied).

An earlier case interpreting the principles of Crumady was General Electric Company v. Moretz, 4 Cir., 1959, 270 F.2d 780, cert. den. Mason & Dixon Lines Inc. v. General Electric Co., 1960, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545, where the court stated on page 789 of 270 F.2d:

> "We applied the same rule in our decisions in Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79, and in American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, in both of which it was held that a shipowner was liable to an injured longshoreman for injuries suffered in the use of unseaworthy equipment furnished by

the ship, but that the shipowner was nevertheless entitled to indemnity from the stevedoring contractor because the latter *negligently* used the equipment in the performance of its contract." (Emphasis supplied).

The cases cited in Moretz again repeat the theme that negligence on the part of the stevedoring company is the source of the breach of its contractual undertaking, creating liability to indemnify the ship, for example:

"Nevertheless, the ship [in Crumady] was allowed to recover over for the stevedore's *negligence* which was found to be a breach of its warranty of workmanlike service." (Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79, 80, cert. den. 1959, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62; emphasis supplied).

"Export impleaded the United States and Whitehall as third-party defendants, claiming indemnity for any recovery which Revel might obtain, on the theory that the accident resulted from the *negligence* of the longshoremen supplied by the United States and Whitehall." (American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, 84; emphasis supplied).

In view of this repetition of the requirement that the stevedoring company's conduct be negligent, this court does not consider such language to be inadvertent or without significance. To determine what negligent conduct is sufficient to amount to a breach of one's implied contractual warranty of workmanlike service this court has closely considered the factual background of each of the above four cited cases from the Fourth Circuit and finds that in each instance actual knowledge of, or knowledge sufficient to put one on inquiry as to, a defective, unsafe condition existed. In Smith the third-party defendant's safety man [1] had observed that a ladder was without bolts and yet failed to make a more thorough inspection as to the method of fastening, which would have disclosed that the ladder was not safe for use. In Moretz the third-party defendant's officials were notified that cargo was improperly loaded but made no change in its disposition. In Calmar the stevedoring company was found to be negligent, both in having used an unseized light and having lowered it into the hold in an unsafe manner. The negligent conduct on the part of the stevedoring company in the Revel case consisted of continuing to operate a defective winch after actual knowledge that it was not working properly. From the language and the facts of these cases, the court can conclude only that a stevedoring company is not liable for indemnity where, without negligence and without knowledge, actual or construc-

---

[1]. The testimony of Hall, the superintendent in charge of repairs for Herd, should not be tortuously misconstrued to assign to him the role of a safety man responsible for safety inspections of ship's appurtenances. Third-party plaintiff in all honesty made no attempt to do so, nor would the record support such a finding of fact. Hall's job was to repair any damage done by the stevedores in discharging the cargo. His work began only after a hold was emptied. He testified:

"Q Mr. Hall, will you explain briefly just what you do in connection with a ship that is, discharging ore?

"When do you first go to the ship, and what do you do after you get there?

"A As soon as the first hold of the ship is empty, I go to the chief officer and inspect the hold for damage.

"Q And continue that right straight through the operation of unloading?

"A Yes, I do." (Transcript, page 39). As has been previously noted, visual inspection would not have revealed the latent defect in the ladder rung pragmatically demonstrated by the immediately prior use of the ladder by eleven longshoremen, not shown to be suicide-prone, in leaving the hold, and an unknown number in entering the hold; nor was any type of inspection that was reasonable or practical under the circumstances suggested to the court by third-party plaintiff; nor does it independently occur to the court.

tive, it brings, what is assumed to be for the purposes of this suit, an unseaworthy condition into play.

The United States Courts of Appeals have consistently interpreted Crumady as based upon the negligence of the stevedoring company. In Royal Mail Lines, Ltd. v. Peck, 9 Cir., 1959, 269 F.2d 857, 864, the court construed Crumady in the following language:[2] "Since there would have been no accident or injury if the longshoremen had not taken independent negligent action, recovery by the ship against the stevedore was allowed." King v. Waterman Steamship Corp., 3 Cir., 1959, 272 F.2d 823, 825, cert. granted 1960, 362 U.S. 926, 80 S.Ct. 754, 4 L.Ed.2d 745, reversed 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169, in denying indemnity (a holding which was reversed by the Supreme Court) stated the shipowner's theory of recovery as follows— "appellant claims indemnity from the stevedoring company on the theory that primary responsibility for the accident and an obligation to indemnify the shipowner should be imposed on the appellee because the immediate cause of the accident was appellee's negligence in unloading the cargo, improper though the stowage admittedly was." Two cases in the Second Circuit have also discussed Crumady. In Latus v. United States, 2 Cir., 1960, 277 F.2d 264, 267, cert. den.

1960, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed. 2d 55, Judge Learned Hand said "in Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, a stevedore's employee had sued the ship in rem as unseaworthy and had recovered; and the shipowner sued the libellant's employer for its negligence." Earlier in Dunbar v. Henry Du Bois' Sons Company, Inc., 2 Cir., 1960, 275 F.2d 304, 307, cert. den. 1960, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46, the Second Circuit had said "Juxtaposing Crumady and McWilliams Blue Line, it becomes clear that appellant has set forth a cause of action against Bronx Towing by alleging that the unseaworthy condition of the Trenton which led to Dunbar's death was brought into play by the negligent manner in which the tug Cortland performed its towing operation."

The District Courts likewise have consistently interpreted Crumady as based upon the negligence of the stevedoring company. See: Mickle v. The Henriette Wilhelmine Schulte, D.C.N.D.Cal.1960, 188 F.Supp. 77, 79; Hershey Chocolate Corp. v. The S.S. Robert Luckenbach, D.C.Or.1960, 184 F.Supp. 134, 140, affirmed 9 Cir., 295 F.2d 619, 1961 A.M.C. 2215.

The commentators also follow this construction. See: Ball, At Sea with the

---

2. Third-party plaintiff relies strongly, if not exclusively, upon certain broad language in Hugev v. Dampskisaktieselskabet, D.C.S.D.Cal.1959, 170 F.Supp. 601, 610, affirmed 9 Cir., 274 F.2d 875, cert. den. 1960, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147. This reliance is unwarranted for a number of reasons. First, the lower court rendered its decision before the decision in Crumady and before the decision of the Court of Appeals for the Ninth Circuit in Royal Mail Lines, allowing recovery over solely on the ground that the independent negligent action of the stevedoring company caused the accident in question. Secondly, the trial court in the portion of the opinion relied upon by third-party plaintiff was construing the implied obligation of the shipowner to warrant to the stevedoring company the seaworthiness of the ship's gear. When the trial court dealt in its

opinion with a breach of said warranty by the shipowner it stated:

"Furthermore, if it were assumed arguendo that the misplaced 'queen beam' was a breach by the shipowner, the stevedoring contractor was fully aware of this latent condition prior to plaintiff's injury and nonetheless willingly proceeded with the work despite the known dangerous condition, and hence would be held to have waived the breach." (170 F. Supp. 601, 611).

As under the facts of that case the stevedoring company had actual, not constructive, knowledge of the insecure hatch boards, Hugev certainly is not authority for any general proposition that if there is no direct knowledge of a dangerous condition, a stevedoring company must nevertheless suspect such a condition in every case, and do everything necessary to disclose the unknown, the unexpected, and perhaps the nonexistent.

United States Supreme Court, 38 N.C.L. Rev. 307, 357 (1960):

"It is against the background of these cases that the majority in Crumady allowed the shipowner indemnity against a stevedoring company which by its own *negligence* brought into play an unseaworthy condition of the vessel, a condition which was created by the shipowner but made operative by the *negligence* of the stevedoring company." (Emphasis supplied).

Gilmore & Black, although a pre-Crumady publication, appears to have anticipated the problem now before this court by stating that where the longshoreman collects damages from the shipowner whether the action be described as in tort for negligence or *under maritime law for unseaworthiness,* there could be no recoupment back against the innocent employer. (Gilmore & Black, The Law of Admiralty—Chapter 6, Section 6–57, page 373).

This court has found no authority for third-party plaintiff's theory that Herd's non-negligently bringing into play an unseaworthy condition of an appurtenance of a ship, Herd having neither actual nor constructive knowledge of such unseaworthiness, is sufficient to require indemnity.[3] The stevedoring company has never been held to warrant the condition of a vessel's appurtenances. "Workmanlike service" is the implied standard which the stevedoring company must meet, but no case has ever defined it as a standard of perfection. The stevedoring company should not be held to be an insurer. The stevedoring company fulfills its warranty of workmanlike service when it performs its duties "in a reasonably safe manner."[4] As the Supreme Court has held that a ship is not absolutely liable for all defects even to a member of the crew,[5] a fortiori should the stevedoring company not be absolutely liable for all defects not in its own gear but in the ship's gear.

3. For a very similar case to the instant one, see Calderola v. Cunard Steamship Co., 2 Cir. 1960, 279 F.2d 475, cert. den. 1960, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed. 2d 104. In that case the ship had a contract with the stevedore whereby the latter agreed to provide all necessary labor "for the proper and efficient discharging of cargo," the equivalent of the contract implied in Ryan and Weyerhaeuser. The stevedoring company was held obligated to perform its services "with reasonable safety" and was "not required to act as an insurer against any loss by Cunard or to *discover and correct every hidden danger.*" (Emphasis supplied). There the longshoreman had slipped on some grease on a rung of one of the ship's ladders. The ship was found to be unseaworthy and the plaintiff longshoreman recovered damages. The District Court granted indemnity, but the Court of Appeals reversed, stating at page 478 of 279 F.2d "absent knowledge or constructive notice of the presence of the grease, the stevedore could only have breached its contractual duty if the conduct of its employees created the dangerous condition."

4. Ryan Stevedoring Company, Inc. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 132, 76 S.Ct. 232, 100 L.Ed. 133.

5. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, states the law to be as follows:

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354."

Because of the relationship between the ship and a seaman, and the Supreme Court found equivalence in this respect between a seaman and a longshoreman, the ship may be liable to a longshoreman without negligence. But the relationship of a stevedoring company to the ship is not founded on such principle of relationship, but upon the contract, express or implied, to perform workmanlike service. This does not include a warranty by the stevedoring company against damages from non-negligent use of a ship's latently defective appurtenances.

The court can but conclude, as all of the reported cases require independent negligence on the part of the stevedoring company for recovery over, that against the factual background of this case Herd under the tests set out in Crumady is not liable in indemnity for non-negligently bringing into play an unseaworthy condition which consisted of a latent defect in an appurtenance of the ship.[6]

Judgment accordingly.

6. As the third-party complaint has been disposed of on this ground and as the record is silent as to the conduct of the shipowner, the court has not found it necessary to consider whether or not there was conduct on the part of the third-party plaintiff sufficient to preclude recovery over.