**MOORE–McCORMACK LINES, INC.,**
Appellant,

v.

**MARYLAND SHIP CEILING COMPA-**
**NY, Inc., Appellee.**

No. 8652.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 6, 1962.
Decided Dec. 27, 1962.

Randall C. Coleman, Jr., Baltimore, Md. (Jervis Spencer Finney and Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for appellant.

David R. Owen, Baltimore, Md. (Peter Parker and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.

Before SOPER and J. SPENCER BELL, Circuit Judges, and BUTZNER, District Judge.

SOPER, Circuit Judge.

Richard F. Jenkins and Frank J. Malikowski, ship ceilers or carpenters, in the employ of Maryland Ship Ceiling Company, Inc., were made ill and suffered injuries from noxious fumes and gases as they were performing ship ceiling services in the hold of the steamship MORMACSTAR in the harbor of Baltimore, Maryland, on November 21, 1959. The ship had been loaded with hogsheads of tobacco in holds No. 1 and No. 2 on November 20, 1959 at Norfolk, Virginia. The tobacco had been previously fumigated with hydrogen cyanide by an agent of the ship owner at the terminal dock in Norfolk, and on the evening of that day she sailed, with the hatches battened down, for Baltimore, arriving the next morning. In the interval, fumes arising from the fumigation of the cargo accumulated in the holds of the vessel and caused the illness of the carpenters when they entered the holds to do their work. Jenkins and Malikowski brought the instant suit against the owners of the ship, alleging that the ship was unseaworthy and that her owner was negligent in failing to furnish a safe place for them to work. Jurisdiction was based on diversity of citizenship.

The ship owner filed a third party complaint against the ship ceiling company, alleging that the injuries to the carpenters resulted from the failure of their employer to perform its work in a careful and workmanlike manner. At the trial before the District Judge with a jury, the ship owner admitted that the vessel was unseaworthy when she was discharged in Baltimore, and evidence was then taken upon the claim of the ship owner for indemnity against the ship ceiling company. At the conclusion of the evidence, the ship owner, as third party plaintiff, moved for a directed verdict in its favor against the ship ceiling company on the issue of indemnity but the motion was denied. The correctness of this ruling, which is the principal question before the court on this appeal, requires a consideration of the evidence which may be summarized as follows.

The loading operation at Norfolk was supervised by Frank L. Ostroski, Chief Mate of the ship. He found the conditions normal and the air clean in holds Nos. 1 and 2 where the tobacco was stowed. He was not aware that the tobacco had been fumigated by the ship owner's agent in Norfolk, although a list of the cargo furnished by the agent showed that one lot of the cargo stowed in hold No. 2 had been fumigated. Had he known of the fumigation he would not

have been apprehensive for he had encountered no difficulty with tobacco in his experience of 20 years on the sea.

On the morning of November 21, 1959 at 8 A.M., eight employees of the ship ceiling company, under the supervision of their foreman, Edward M. Lipo, boarded the vessel at Baltimore to shore up the cargo in accordance with an arrangement that had been made between the ship owner and the ship ceiling company. After a conference between Lipo and the Chief Mate of the ship the carpenters, under Lipo's supervision, secured the cargo on the main deck and then uncovered the hatch to No. 1 hold in order to enter and shore up the hogsheads stowed therein. One section or pontoon of the five which constituted the hatch of No. 1 hold was taken out in order to make an entrance into the hold; and, when this was done, everyone present noticed an odor emanating from the hold which was variously described as peculiar, musty, unfamiliar, awful or unpleasant. Jenkins, one of the plaintiffs, then summoned Lawrence A. Burlingame, who had also come aboard at 8 A.M. that morning as a Relief Deck Officer and Mate to relieve the regular deck officers of the ship. It was Burlingame's duty on behalf of the ship to supervise the proper loading and discharge of the cargo, and he had the authority to stop any hazardous action in the course of the operation. When he arrived at the No. 1 hatch, the carpenters called his attention to the strong smell coming from the hold; and, according to their testimony, he assured them that the odor came only from the tobacco and that there was not anything harmful in the hold. Relying upon this assurance, the carpenters entered the hold, and very soon the complainants suffered the ill effects above described. Because of the disagreeable odor, the foreman of the carpenters instructed the men, as a safety precaution, to enter the hold in pairs and to come out immediately if they felt any ill effects. This practice is frequently followed. The removal of all of the sections of the hatch would doubtless have helped to ventilate the hold more effectively than the removal of only two sections but it was not shown that this precaution would have prevented the injuries suffered by the plaintiffs in this case.

It was later shown by expert testimony that the fumes did not consist merely of the odor from tobacco but of hydrogen cyanide gas the odor of which is so similar to the odor of tobacco that a layman would not recognize it as dangerous. Prior to assuring the carpenters that the situation was not dangerous, Burlingame had made no inquiry, had been given no instructions and had no knowledge as to the nature of the cargo. He had not seen the stowage plan of the cargo, and, until he looked into the hold, he did not know that the ship carried tobacco. Nor did he note the cargo document furnished to the ship owner in Norfolk which showed that at least a portion of the cargo had been fumigated. The existence of this document was not disclosed to the officers of the ship by the agent of the ship owner which had the cargo fumigated at Norfolk. Lipo, the carpenters' foreman, was not told that the cargo had been fumigated.

Upon this evidence, the case was submitted to the jury after a charge by the court. Requests were made by the ship ceiling company as third party defendant for the submission of specific issues or interrogatories to the jury. After consideration of these requests, the Judge prepared and submitted to the jury the interrogatories which are appended below with the jury's answers.

"1. Was the S.S. MORMAC-STAR unseaworthy with respect to its No. 1 hold at the time of the accident, in that said hold was filled with a dangerous amount of hydrogen cyanide gas, and was this unseaworthy condition the proximate cause of the plaintiff's injuries?

"Yes.

"2. Did the relief officer, Burlingame, in effect, tell the foreman,

Lipo, that only hogsheads of tobacco were in the No. 1 hold and that it was all right to send his men down there?

"Yes.

"3. If the answer to Interrogatory No. 2 is 'Yes', did the Maryland Ship Ceiling Company foreman, Lipo, act reasonably and with due care in sending men into the No. 1 hold in reliance upon this statement.

"Yes.

"4. If the answer to Interrogatory No. 2 is 'No', did the Maryland Ship Ceiling Company foreman, Lipo, nonetheless, under all the circumstances, act in a reasonably safe and workmanlike manner when he ordered the carpenters to enter the No. 1 hold?

"Did not answer.

"5. Was the presence of hydrogen cyanide gas in the No. 1 hold such a dangerous condition that the Maryland Ship Ceiling Company, by the exercise of reasonable care, should have discovered?

"No.

"6. If the answer to Interrogatory No. 5 is 'Yes', did the Maryland Ship Ceiling Company, nonetheless, under all the circumstances act in a reasonably safe and workmanlike manner in ordering, through its foreman, the carpenters to enter the No. 1 hold in pairs?

"Did not answer.

"7. Did Moore-McCormack exercise ordinary care under the circumstances to place the S.S. MORMACSTAR in such condition that an expert, and experienced ship ceiling contractor, mindful of the dangers he should reasonably expect to encounter, would be able, by the exercise of reasonable care, under the circumstances, to shore up the cargo in a workmanlike manner and with reasonable safety?

"No.

"8. Was the presence of cyanide gas in the No. 1 hold such a latent or hidden danger that is not usually encountered by an expert and experienced ship ceiler?

"Yes.

"9. If the answer to Interrogatory No. 8 is 'Yes', did Moore-McCormack know or, by the exercise of ordinary care under the circumstances, should it have known of this dangerous condition?

"Yes.

"10. If the answer to any of Interrogatories No. 3, No. 4, or No. 6 is 'No', was the failure of the Maryland Ship Ceiling Company to act in a reasonably safe and workmanlike manner a proximate cause of the accident?

"Did not answer."

In addition, the jury rendered a general verdict in favor of the ship ceiling company as third party defendant on the claim for indemnity for the ship owner as third party plaintiff.

We consider first the contention of the ship owner that the Judge erred in denying its motion for directed verdict against the ship ceiling company for indemnity. In this connection, the jury found, in answer to specific questions propounded by the Judge that the ship was unseaworthy because of the presence of the noxious gas and that this condition was the cause of the plaintiff's injuries. This portion of the verdict the ship owner concedes to be correct. The jury, however, also found (1) that the ship owner knew, or by the exercise of reasonable care, should have known of the dangerous condition; (2) that the presence of the gas in No. 1 hold was a condition not usually encountered by an experienced ship ceiler; and that the presence of the gas was not a condition that the ship ceiling company by the exercise of reasonable care should have discovered; (3) that Burlingame, the relief officer of the ship, told Lipo, the carpenters' foreman, that it was all right to

send the men into the hold; and (4) that Lipo acted with due care in relying upon the statement of Burlingame.

The jury also found in general terms that the ship owner did not exercise ordinary care in conditioning the ship in such a manner that an experienced ship ceiling contractor would be able by the exercise of reasonable care to shore up the cargo with reasonable safety.

The question is whether there was substantial evidence to support the jury's findings. The ship owner contends that the ship ceiling company had knowledge that something was amiss since its foreman and the carpenters smelled the unusual odor, made specific inquiry of the deck officer as to the cause and took the precaution of sending the workers only in pairs into the hold with orders to come out immediately if they found conditions uncomfortable. Having suspected that the condition was dangerous the ship ceiling company, it is said, rendered itself liable to indemnity when it sent its men into a condition of danger.

This argument, however, takes into consideration only a portion of the relevant facts. It is conceded that the dangerous condition was caused entirely by the action of the ship owner's agents and officers in having the tobacco fumigated before it was loaded on the ship and in having it stored in closed holds of the ship without warning to the crew that the cargo had been fumigated. The ship owner was, of course, charged with the knowledge of what its agents had done and was responsible for their actions. The carpenters entered the hold only after they had been assured by the ship's officer that the condition was safe; and there was expert testimony that the odors of hydrogen cyanide and of tobacco are so similar that a layman might easily confuse them. Hence, there was reasonable ground for the finding that the carpenters reasonably relied upon the assurance of the deck officer that it was safe for them to enter the hold.

The ship owner stresses particularly the failure of the carpenters to remove all of the pontoons of the hatch cover in order to ventilate the hold and thereby dissipate the gas. It is argued that since the carpenters were aware of the presence of disagreeable and unpleasant fumes, care would have led them to ventilate the hold before entering. There was testimony that only one section of the hatch cover was removed because of the shortage of men and countervailing testimony that it is not unusual in an operation of this type to remove only a portion of the hatch cover. There was expert testimony that the way to remove hydrogen cyanide gas from a fumigated cargo is to dissipate it with clean air, the more air the better, and that, consequently, before sending the men into the hold in pairs, it would have been a reasonable precaution to remove the remaining pontoons from the hatch for purposes of ventilation. Undoubtedly, this evidence was relevant and possessed probative value; but, it was only a part of the whole testimony submitted to the jury, all of which they were obliged to pass on in determining the existence of negligence on the part of the ship ceiling company. It did not compel a directed verdict in favor of the ship owner. In summation, there was evidence from which a jury might find that the dangerous condition was caused by the ship owner and its agents and that the employees of the ship ceiling company were not negligent in attempting to do their work after receiving assurances from an officer of the ship that the condition was not dangerous.

In reaching this conclusion we do not overlook the decisions which hold that a vessel owner may not be denied indemnity merely because he has not fully performed all of his obligations to persons who have contracted to perform services for him on the ship. Thus, it was held in Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, that a ship owner's failure to perform its obligation to supervise the stowage of a cargo did not destroy its claim to indemnity from

a stevedoring company which had contracted to perform all the stevedoring operations required by the ship owner in its coastwise trade. The stevedore had stowed a cargo so carelessly at one port that one of its employees was injured in unloading the ship at a subsequent port of discharge. The Supreme Court held that, as between the parties, the failure of the ship owner to discover the stevedore's carelessness in the loading port did not forfeit the ship owner's right to indemnity for damages caused to the workman at the port of discharge.

Again, in Weyerhaeuser S. S. Co. v. Nacirema Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, a stevedoring company, in unloading a ship, made use of an insecure temporary winch shelter which had been used at a previous port and, through the carelessness of the ship owner, had been allowed to remain on the ship when she sailed. It was held that the ship owner was not deprived of its right to indemnity against the stevedore for injuries to a workman caused by the careless use of the shelter by the stevedoring company at the port of discharge. The court held that it was error to direct a verdict for the stevedore on the issue of indemnity and that the matter should have been submitted to the jury. It was specifically held that if a stevedore renders a substandard performance which leads to liability of the ship owner the latter is entitled to indemnity "absent conduct on its part sufficient to preclude recovery."

The Supreme Court considered the same matter in Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413, in which, as in the instant case, a stevedore workman was injured in the unloading of the ship by an accident which was traceable to the unseaworthy condition of the ship. It was found, however, that the primary cause of the accident was the negligence of the stevedoring company in using a winch for unloading the cargo which had been previously set by the ship's crew for other work in a way which made it improper

for the work at hand. It was held that the ship was entitled to indemnity. We applied the same principle in Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 266 F.2d 79; American Export Lines, Inc., v. Revel, 4 Cir., 266 F.2d 82, and Smith v. Jugosalvenska Linijska Plovidea, 4 Cir., 278 F.2d 176.

It will be observed that in all these cases the ship's right of indemnity was preserved, although the unseaworthiness of the ship was established, because it was also shown that the stevedoring company, having knowledge of the defective condition on the ship, carelessly made use of defective equipment or proceeded with the work under defective conditions so that its actions constituted the immediate cause of the injury. No such situation is found in the facts of the pending case.

■ The primary cause of the injury was the unseaworthiness of the ship. The jury found that the ship ceiling company was free from negligence in causing its men to enter the hold of the ship since it had no knowledge of the dangerous conditions, could not reasonably have been expected to know of the presence of the hydrogen cyanide gas and was led to proceed with its work by the assurances of the Relief Mate of the ship that it was safe to do so. We think that there was substantial evidence to support the ruling of the Judge and the findings of the jury in this respect and that the facts of the case warrant the finding that the performance of the ship, in the language of the Supreme Court in the Weyerhaeuser case, 355 U.S. 563, 567, 78 S. Ct. 438, 440, amounted to "conduct on its part sufficient to preclude recovery."

■ The ship owner contends that the Judge erred in his instructions to the jury and in framing the questions submitted to the jury for decision. In the charge the Judge instructed the jury with reference to the claim of the ship owner against the ship ceiling company for indemnity. The jury were told in effect that the ship owner could not recover on

this claim unless the ship owner "fully performed" its obligations to the ship ceiling company under the contract; and that these obligations included the duty to exercise ordinary care to place the ship and its equipment in such condition that the ship ceiling company, mindful of the dangers usually encountered, would be able to shore up the cargo in a workmanlike manner and with reasonable safety and also the duty to give the ship ceiling contractor a reasonable warning of latent or hidden dangers. It is argued that, under the decisions of the Supreme Court and of this court cited above, a ship owner under certain circumstances may recover indemnity from a contractor even if it has not performed all of the obligations resting upon the owner of a ship. Undoubtedly, this is true and the portion of the instruction that the ship owner could not recover unless it had "fully performed" all of its obligations, taken by itself, was too broad; but it is obvious that the jury were not misled. It was made clear to the jury that the ship owner had failed to furnish a seaworthy ship and, therefore, had admitted liability to the injured men, and yet the right of the ship owner to indemnity was submitted to them for decision. The difference between the ship owner's obligations to the individual workmen and its obligations to the ship ceiling contractor was pointed out, and the jury were told that it was the performance of the latter obligations which was a prerequisite to the recovery of indemnity. Moreover, the interrogatories addressed to the jury called their attention to crucial points in the evidence on which the parties relied for their conflicting contentions, so that the jury were made aware of the area of conflict which they had to consider in making their determination. We think that the ship owner suffered no detriment through the use of the broad language in the charge of which it complains.

The ship owner also finds fault with interrogatories 2 and 3 addressed to the jury which required the jury to find whether the relief officer of the ship told the foreman of the carpenters that only tobacco was in the No. 1 hold and that it was all right to send the men into the hold, and whether, if the answer to this interrogatory was yes, the foreman of the carpenters acted reasonably in sending the men into the hold in reliance upon the mate's statement. It is said that these two interrogatories were improper because they assumed that the foreman had the right to rely on the statements of the relief officer. We think that this criticism is not justified. The Judge made it clear to the jury that they could not decide in favor of the ship ceiling company if they found that it was negligent in allowing the carpenters to enter the hold when, by the exercise of ordinary care, it should have known that it was dangerous to do so. In answering this inquiry it was important to determine exactly what the Relief Mate had said to the carpenters' foreman in respect to the condition of the hold. This was important because of conflicting evidence on the point. We see no error in asking this question of the jury, especially as in the next breath the jury were asked to determine whether the carpenters' foreman acted with due care in reliance upon the statement of the Relief Mate. Objections to the remaining inquiries Nos. 5, 7 and 8 do not call for extended discussion on our part. An examination of the interrogatories set out above clearly indicates that they were addressed to important points of the evidence and that the consideration of them was helpful to the jury in making its final general determination on the question of indemnity.

Affirmed.