Theodore WUJEK

v.

COMPANIA SUD AMERICANA DE VAPORES, Defendant and Third-Party Plaintiff,

v.

ROBERT C. HERD & COMPANY, Incorporated, Third-Party Defendant.
Civ. A. No. 11836.

United States District Court
D. Maryland.

Jan. 6, 1964.

Fred Ginsberg and Eugene V. Chircus, Baltimore, Md., for plaintiff.

David R. Owen, Baltimore, Md. (Semmes, Bowen & Semmes), Baltimore, Md., for third-party defendant.

Herbert F. Murray and Clater W. Smith, Baltimore, Md., for defendant and third-party plaintiff.

R. DORSEY WATKINS, District Judge.

Plaintiff, Theodore Wujek, (plaintiff), a longshoreman employed by Robert C. Herd & Company, Incorporated, Third-Party defendant (Herd), sued Compania Sud Americana De Vapores, defendant and third-party plaintiff (ship) for injuries allegedly sustained on October 13, 1959, while working on the ship, when a hatch board broke under him. The complaint alleged that the board broke because it was defective. More specifically, it was claimed that the board, unknown to plaintiff, had been cracked sometime before the accident and that it broke under his weight.

The trial of the case began on September 12, 1962, but was settled between plaintiff and the ship on that day during the course of the trial. The ship kept open its claim for indemnity against Herd. The ship's claim was based on the theory that, if the board were cracked, Herd either caused this condition, knew of it, or should in the use of reasonable care have known of it, before the accident. Herd denied the charges, or any liability for indemnity.

There was no written indemnity agreement between the ship and Herd.

A pretrial order had been entered providing that the claim of the ship against Herd should first be tried on the issue of liability, and if such were found, the issue of damages should then be tried, following the procedure in Ray v. Compania Naviera Continental, D.Md.1962, 203 F.Supp. 206.

The case between the ship and Herd was tried on November 21, 1963, and the plaintiff, a longshoreman in plaintiff's gang, and an expert witness, a structural engineer, all called by the ship, testified. A deposition of an officer of the ship was also offered by Herd, except certain hearsay statements on the last page, as to which objection was sustained.

It was stipulated that the board on which plaintiff stepped and which broke, had been cracked before the accident; and that the weight of a man, such as the plaintiff, would not have caused the board to break, if it had not then been cracked.

The case was argued at the conclusion of the testimony, but decision was postponed until after the filing of briefs, which have now been received and studied.

The court finds as facts that plaintiff was injured while working on the 'tween deck of No. 1 hatch. This deck consisted of three sections each approximately nineteen and one half feet wide and approximately nine feet, one and one half inches fore and aft. Each "board" is really two boards joined together by three dowel pins, and by steel bands near each end, and measures about sixteen and three-quarter inches across, two and three-quarter inches thick, and about nine feet one and one-half inches long. There are fourteen such boards in each section, or forty-two boards to a hatch, and some four hundred boards for the entire ship. The boards, when in place, are supported on steel cross beams about four and one-half feet apart. The "board" in question broke about one foot from one end. The short piece has not been accounted for. The long piece was offered in evidence. Of the two planks composing it, one showed a splintering type break, and the other a shearing break at a point partially occupied by a knot.

It is not entirely clear whether or not plaintiff had previously removed any of

the 'tween deck boards to work in the lower hold. It is clear that plaintiff assisted in replacing some of the 'tween deck boards; that in so doing he followed the usual procedure of working one end with a handle or hook; that he was working fast and not paying much attention to the condition of the boards; that he had no difficulty in fitting any of them into place; that he made no complaint about the condition of any boards, and heard of none; that he does not recall that he or any one noticed any defect; that if in placing boards, he had seen anything wrong he would have called the mate, and if no replacement was furnished, he would use what they had, taking out the bad board [1]; sometimes boards are upside down, and have no handles; he normally would not have turned boards over to examine them; he did not see or know anything was wrong; and if he had known the board was bad, he would not have stepped on it.

The testimony also made it clear that the boards were furnished by the ship; and that the ship customarily inspected hatch boards on each voyage, in Chile and in the United States.

Plaintiff also testified that just before his accident a tractor was gently lowered onto the hatch boards in front of him; that he unhooked the tractor and stepped back on the board which broke; that the tractor had not been landed on this board.[2]

May, a worker in the same gang as plaintiff, was called by the ship. He repeatedly pointed out that the accident had happened some four years before;

that he worked on three or four ships a week, and really remembered only that plaintiff fell. He did, however, testify as to some trouble with the hatch boards, mostly that they were too long, although there was complaint [3] of some cracked boards. Some were good, some were bad, some were cracked,[4] some were chipped, the same as on all ships. If a cracked board were found, it would be placed where the men were not working; or a new board would be obtained from the mate; or a good board would be obtained from another part of the ship.

If a board looked good on the top, it was not the practice to turn it over and look underneath. May could not recall if the boards were clean or dirty; a condition highly material as to the visibility of cracks.

The ship's main argument is that Herd had knowledge of complaints about the condition of boards "in the very hold where plaintiff was working", and permitted the work to continue, the accident resulting from a cracked hatch board; and that this constituted a breach of the warranty of workmanlike service; that Herd should have suspended the loading operations. The ship relies on Hugev v. Dampskisaktieselskabet International, D. C.Cal.1959, 170 F.Supp. 601, affirmed 9 Cir.1960, 274 F.2d 875, cert. den. 1960, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147; Williams v. Lehigh Valley Railroad Co., D.C.N.Y.1957, 151 F.Supp. 809; Parenzan v. Iino Kaiun Kabushiki Kaisya, 2 Cir.1958, 251 F.2d 928, cert. den. 1958, 356 U.S. 939, 78 S.Ct. 781, 2 L.Ed. 2d 814; Wyborski v. Bristol City Line of

---

1. Plaintiff's testimony as to what would be done if a complaint were made and the ship failed to furnish a new board is not entirely clear. His statement that the stevedores would "use what they have" might indicate that they would use bad boards. His further statement that if he "saw something wrong" or if he noticed "one that looked too bad" they would take it out, is consistent with the testimony of his gang companion, May, that a bad board would not be used in a working area.

2. This, the only evidence as to the landing of the tractor, completely destroys the ship's only affirmative effort to prove negligence by Herd, the ship having claimed that the board in question had been, or might have been, broken by the dropping of the tractor upon it; obviously a stevedoring act.

3. Complaint would indicate that there had been an inspection of some sort.

4. There was no testimony as to the nature of these cracks, or cracks generally; whether they ran lengthwise or crosswise of the planks.

Steamships, Ltd., D.Md.1961, 191 F. Supp. 884; and Berti v. Compagine de Navigation Cyprien Fabre, 2 Cir.1954, 213 F.2d 397.

As indicated, the "complaints", of which plaintiff was unaware, related primarily to the length of the boards; and even so, the boards were in about the same condition as those on any other ship. There is no evidence of any complaint about the particular board in question, and no showing of what inspection would have been required to discover the pre-existing crack in these particular planks. However, even on the basis of the ship's broad generalization, the cases it relies upon are readily distinguishable.

Hugev dealt with an obviously and known improperly placed hatch beam. The stevedore foreman observed this, stopped the work, consulted with the Mate, who confirmed the condition, but the foreman permitted work to resume.

In Williams there was an express agreement more stringent than the implied warranty of workmanlike service. The accident resulted from the use of dunnage, furnished by the stevedore, used with actual knowledge of its condition, which condition, coupled with failure by the stevedore to furnish adequate lighting, was the very cause of the accident.

In Parenzan the longshoremen had been warned of and knew the specific condition of the dunnage that was used, and failed to take the customary precautions as to which expert testimony had been offered.

In Wyborski the gang carrier had been warned that physically strong dunnage was dangerously slippery from grain dust, but he selected and used the dunnage without having it cleaned.

In Berti, the stevedore was fully aware of the precise defect in a winch cable but proceeded to use it without taking the necessary precautions.

There is no evidence that any complaint was made about the very board which caused plaintiff's injuries, or that complaint was made as to *any* board having a similar defect.

The boards in question were furnished by the ship. If ship routine had been followed, they had been inspected in Chile, and in Baltimore, Maryland. The ship does not undertake to show what kind of an inspection Herd should have made, or would have had to make, to reveal the defect. In fact, nothing but a thorough examination of each board, individually, through its entire length, breadth and thickness would have sufficed; and to be really meaningful, *each board would have had to be thoroughly cleaned throughout*, to be sure that no defect was concealed, or covered up.[5] The complete impracticability of any such procedure, and the certainty that the ship would not hire and pay a stevedore for the time necessary for such inspection, is clear.

This case falls directly within the principles applied in Ray v. Compania Continental, D.Md.1962, 203 F.Supp. 206, 211–214[6]; Cia. Maritima Del Nervion v. James J. Flanagan Shipping Corp., 5 Cir.1962, 308 F.2d 120, 123–125; Ferrigno v. Ocean Transport Ltd., D.C.S.D.N.Y.1961, 201 F.Supp. 173, 183–184 (notice of missing ladder rung not notice of a loose rung, from which employee fell; affirmed on this point, 2 Cir.1962, 309 F.2d 445). See also Moore-McCormack Lines, Inc. v. Maryland Ship Ceiling Co., 4 Cir.1962, 311 F.2d 663 (distinguishable on ground of assurance given by mate, but recognizing that knowledge or notice of one risk does not constitute constructive notice of a much more serious one).

---

5. Perhaps a structural engineer, such as the ship's expert witness, should also be present to make at least rough computations as to fibre stresses of various types of wood, dependent in part upon the location of any defect, and its position relative to support of the board.

6. Distinguishing Smith v. Jugosalvenska Linijska Plovida, 4 Cir. 1960, 278 F.2d 176; as to which see also Moore-McCormack Lines, Inc. v. Maryland Ship Ceiling Company, 4 Cir. 1962, 311 F.2d 663, 668.

The third-party complaint should be and hereby is dismissed, and the Clerk is directed to enter judgment for the third-party defendant against the third-party plaintiff.

This opinion constitutes the court's findings of fact and conclusions of law under F.R.Civ.P. 52(a).