GRACE LINES, INC., Appellant,

v.

PORT EVERGLADES TERMINAL COM-
PANY, Appellee.

No. 20469.

United States Court of Appeals
Fifth Circuit.

Nov. 13, 1963.

William C. Norwood, Miami, Fla.,
Fowler, White, Gillen, Humkey & Tren-
am, Miami, Fla., of counsel, for appel-
lant.

G. Morton Good, Miami, Fla., Crom-
well A. Anderson, Miami, Fla., Smath-
ers & Thompson, Miami, Fla., of counsel,
for appellee.

Before RIVES and JONES, Circuit
Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

The controlling question on this ap-
peal is whether the District Court erred
in granting a directed verdict for ap-
pellee, thereby dismissing, without sub-
mission to the jury, appellant's third-
party claim for indemnity against ap-
pellee. We hold that error was com-
mitted; reverse and remand.

The action began in a Florida state
court, from which it was removed to the
District Court by appellant, Grace Lines,
Inc., (Grace). After removal, Grace
made appellee, Port Everglades Terminal
Co., (Port Everglades), a third-party de-
fendant.

The case arose from a maritime ac-
cident which occurred in navigable wa-
ters August 8, 1961, aboard the S. S.
Santa Paula, owned and operated by
Grace. Thomas Taylor, the original
plaintiff, a longshoreman employed by
Port Everglades, which had contracted

with Grace to stevedore the vessel, was working with several co-employees at the 'tween-deck level of the ship's No. 3 hold. They had completed loading a refrigerated compartment with perishables and had begun to secure it when Taylor was injured.

For a clearer understanding of the facts, and the issues thereby presented, we describe briefly how loading and unloading of the type here involved is accomplished aboard this modern ship. Cargo is loaded into this hold on pallets conveyed by a system of endless chains which bring it aboardship through the side of the vessel to a centrally located elevator. This takes cargo down to various levels of decks in the hold. When the desired level is reached, the elevator is stopped and its heavy doors, 16 inches thick, are opened by sliding them on rollers. In unloading the elevator, a device which is called a conveyor is used. It is similar to a small railroad flatcar, and moves upon wheels on steel tracks.

The elevator doors are opened and the conveyor is moved forward to the elevator. Both the elevator floor and the top surface of the conveyor are fitted with endless chains, upon which pallets with cargo are moved from elevator to conveyor, thence into the hold. An electric forklift tractor removes the pallets of cargo and stows them. Discharge of cargo is accomplished in reverse fashion.

Upon completion of loading or discharging, it is necessary to move the conveyor away from the elevator to close its doors so that cold air will not escape from the refrigerating compartment. Being quite heavy, the conveyor can be moved only by the combined strength of four or five men, or by one man using a mechanical ratchet handle operating upon a system of gears. The elevator doors cannot be opened or closed unless the conveyor is stationed several feet away.

One side of the conveyor, and one of the tracks upon which it travels, are fitted with flanges through which holes have been drilled. When the vessel is being readied for sea, the conveyor is moved to a point where the holes in the flanges are in apposition. Then a steel safety locking pin, approximately 4″ long and ¾″ in diameter, is inserted through the holes to secure the conveyor so that it will not move in rough weather. The forklift then is backed to the conveyor and lashed to it.

At the time of the accident, Taylor and his co-employees had moved the conveyor away from the elevator and were in process of closing the doors. One Teracino, second mate of the ship, who was present in the compartment, mounted the forklift and backed it against the conveyor. In doing so he apparently lost control, causing it to strike the conveyor one or more heavy blows, knocking it against Taylor, injuring him.

Taylor's suit against Grace for damages was based on the ship's alleged negligence and unseaworthiness. Grace's third-party action against Port Everglades was for indemnity in the event Grace was held liable to Taylor.

The case was tried to a jury. At the close of the evidence Taylor abandoned his claim of unseaworthiness, which was stricken, and relied solely upon Teracino's alleged negligence for recovery; whereupon Port Everglades moved for a directed verdict against Grace's Third-party claim. The trial judge, apparently relying upon Halcyon Lines et al. v. Haenn, etc., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), and conceiving the law to be that no claim for indemnity will lie unless the stevedoring firm created a condition of unseaworthiness which caused the accident, ruled that, since that element had passed from the case, legally there could be no demand for "contribution between joint tortfeasors." He granted the motion, to which Grace excepted. The case was submitted to the jury which returned a verdict for Taylor against Grace in the sum of $21,136.05.

Grace appeals, not from the verdict and judgment in favor of Taylor, but from the granting of a directed verdict against its claim for indemnity from Port Everglades.

■ In Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court distinguished Halcyon from a case such as this, where indemnity is claimed, by noting that the shipowner's claim in Halcyon was for contribution from a joint tortfeasor. It held that in all stevedoring contracts the stevedore is bound to perform its duties in workmanlike manner, including use of safe methods of operation. "It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." Ryan, 350 U.S. at 133, 134, 76 S.Ct. at 237, 100 L.Ed. 133. The Court concluded that the shipowner may recover full indemnity from the stevedoring contractor if this warranty is breached.

■ Later, in Weyerhaeuser S.S. Co. v. Nacirema Co., 355 U.S. 563, 78 S. Ct. 438, 2 L.Ed.2d 491 (1958), the Court ruled that, even where the injured stevedore had recovered a verdict against the shipowner on grounds of negligence, *not unseaworthiness*, and there was no express indemnity clause, the stevedoring contractor is obliged to perform with reasonable safety and to discharge foreseeable damages resulting from the contractor's improper performance, meaning indemnification of the shipowner. Moreover, it held that the shipowner was entitled to a jury trial, under appropriate instructions, of disputed factual issues on its claim for indemnity against the contractor, after the verdict in the main case. This is required because the liability of the contractor depends on principles different from those governing liability of the shipowner. The Court said: "We believe that respondent's contractual obligation to perform its duties with reasonable safety related not only to the handling of cargo, as in Ryan, but also to the use of equipment incidental thereto, * * *." Cf. Koninklyke Nederlandsche, etc. v. Strachan Shipping Co., 301 F.2d 741 (5 Cir., 1962).

In Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413 (1959), the Court adhered to the same principles, although in that case the stevedoring contract was made by a charterer and not by the shipowner. The Court said that the warranty owed by the stevedore is for the benefit of the vessel, whether its owner is a party to the contract or not.

Gilmore and Black, The Law of Admiralty, 371 (1957):

"Despite Justice Burton's disclaimer, it is obvious that Ryan, by its approval of the indemnity cases, strips Halcyon of any surviving vitality. In the framework of harborworker litigation, there are simply no cases left for the Halcyon rule to apply to unless it be imagined that the harbor-worker's employer was a trespasser on the ship; in all other cases the existence of the contract between employer and shipowner leads automatically to the implied promise by employer to indemnify shipowner. * * * *"

■ This, then, being the law, we now examine the record to see whether jury questions as to the facts concerning the indemnity claim were presented by the evidence. We find that this may be resolved quickly and conclusively.

It is not disputed that the stevedores were responsible for securing the conveyor by placing the steel safety pin in the flanges. It was disputed as to whether they, or the ship's company, owed the duty of moving the forklift to the conveyor and tying them together. Teracino, the mate, testified that he asked the lead stevedore whether the pin was in place; that the latter made a motion indicating he was putting it in the holes, and then told him he had done so. All of the stevedores denied this. Clearly these disputed facts were for the jury's decision. So also was the question of when the pin should have been put in place, before or after the elevator doors were closed; and whether the pin would have held or broken under the impact up-

on the conveyor when it was struck by the forklift. Moreover, such matters as foreseeability and proximate cause, under the facts in dispute, should have been submitted to the jury under appropriate instructions, including the stevedores' duty of performing in workmanlike manner; the mate's duty not to usurp the stevedores' functions at an unexpected time; and possible other factors from which conflicting inferences might have been drawn.

We could say more, but believe we have said enough to show that definite jury questions were presented and that it was error to grant appellee's motion for a directed verdict. Accordingly, the judgment granting the motion is reversed, and the third-party claim is remanded for another trial.

Reversed and remanded.