D/S OVE SKOU, Appellant,

v.

James B. HEBERT et al., Appellees.

PORT ARTHUR SHIPPING CORPORATION, Appellant,

v.

D/S OVE SKOU et al., Appellees.

SOUTHERN STEVEDORING & CONTRACTING COMPANY, Appellant,

v.

D/S OVE SKOU and United Fruit Company, Appellees.

James B. HEBERT, Appellant,

v.

D/S OVE SKOU and United Fruit Company, Appellees.

No. 22205.

United States Court of Appeals
Fifth Circuit.

Aug. 19, 1966.

B. D. McKinney, Dale Harvill, Houston, Tex., for D/S Ove Skou, Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel.

Mayo J. Thompson, Houston, Tex., Royston, Rayzor & Cook, Houston, Tex., of counsel, for Southern Stevedoring & Contracting Co.

L. Dixie Smith, Houston, Tex., Louis V. Nelson, Beaumont, Tex., S. G. Kolius, Houston, Tex., for Port Arthur Shipping Corp.

John N. Barnhart, Houston, Tex., for J. B. Hebert.

J. P. Forney, Eastham, Watson, Dale & Forney, Houston, Tex., for United Fruit Co.

Before JONES and BROWN, Circuit Judges, and DYER, District Judge.

### JOHN R. BROWN, Circuit Judge:

This is another of the growing number of multi-party Donnybrook Fairs in which like Kilkenny cats, American Fidelity & Casualty Co. v. Pennsylvania Threshermen's Casualty Ins. Co., 5 Cir., 1960, 280 F.2d 453, 455, 456, all lash out against each other in the hope that someway from someone, somehow all or part of the Sieracki-Ryan-Yaka-Italia[1] fallout can be visited on another. Here the new twist, if not a wrinkle, Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F. 2d 696, 1963, is a sort of sea-going solomonic distribution through percentage reduction of the injured worker's recovery and a three-way split of the remainder as between the Shipowner and to separate Stevedores. Noah's Ark v. Bentley and Felton Corp., 5 Cir., 1961, 292 F.2d 437, 438, 1961. From the wings, the Time Charterer, exonerated of all primary or secondary liability, comes in to collect its counsel fees and expenses.

All but forgotten in this welter of charge, countercharge, replication, impleader crossclaim and demand for indemnity is the injury sustained by the maritime worker. And yet, despite all of its apparent complexities, this is the key which unlocks the puzzle leading to our affirmance on substantive principles with some adjustments. For once the parties face up to one of the perils of our juridical system in which the event comes finally to be, not so much what it actually was, as what it has been judicially declared to be, this is the key to the riddle. For then it becomes the simple case of a hatch board that is too short.

The Libellant, Hebert, a longshoreman employed by Port Arthur Stevedore,[2] was injured aboard Shipowner's[3] vessel M/V JYETTE SKOU when, in the course of opening up No. 1 hatch at Port Arthur shortly after arrival of the vessel from Houston, a hatch board up-ended causing his foot and leg to drop into the opening producing serious injuries to his back. But that simple occurrence, so simply described, was not long to remain simple.

As Hatch No. 1 had been opened, cargo worked, and reclosed February 27, 1960, at Houston by Houston Stevedore,[4] Shipowner impleaded it, and later Port Arthur Stevedore on the now familiar breach of the implied warranty of workmanlike performance. Likewise, it impleaded Time Charterer,[5] who, in the spirit of the times, in turn impleaded Houston Stevedore and Port Arthur Stevedore on the dual theory of an express contractual indemnity contract and breach of the *Ryan* warranty and the Shipowner for breach of the implied warranty of seaworthiness under the charter party.

Despite these ramifications, the respective theories were also quite simple.

1. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Ryan Stevedoring Co. v. Pan Atlantic SS Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Reed v. The S.S. Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L. Ed.2d 448; Italia Socita Per Azioni di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed. 2d 732.

2. Port Arthur Shipping Corporation.

3. D/S Ove Skou.

4. Southern Stevedoring & Contracting Company.

5. United Fruit Company.
 The charter was a Government form, Produce Exchange Time Charter. The warranty clause prescribed that the owners would " * * * keep the vessel in a thoroughly efficient state in hull, machinery, and equipment for and during the service." It also provided:
 "8. That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency, and Charterers are to load, stow and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented in conformity with Mate's or Tally Clerk's receipts."

Hebert, almost content with the prospect of a decree against a single, solvent respondent, Shipowner, nevertheless sued Time Charterer as well asserting that a vessel with a too-short hatch board was unseaworthy and the owner and Time Charterer were negligent. Shipowner, first denying the occurrence, charged that Houston Stevedore, in knowingly using a too-short hatch board on closing of the hold a few hours before, had breached its WWLP.[6] It charged that Port Arthur Stevedore had done likewise in failing properly to make inspection and discovery of this hazard preparatory to opening the hatch. Against Time Charterer, indemnity was sought because the Charterer was to load and stow the cargo (see note 5, supra). Time Charterer asserted both breach of the WWLP and an express indemnity against Houston Stevedore and Port Arthur Stevedore.[7]

After a trial in which nearly all of the testimony was heard in open court, the admiralty Judge found the ship unseaworthy, Shipowner negligent, Libellant contributorily negligent by 20%, Houston Stevedore breached the WWLP for "placing the hatch board in question * * * and in not observing that it was short * * *," Port Arthur Stevedore breached its WWLP by "removing the hatch board * * * and in not observing that it was short

* * *," but that since Shipowner "created the unseaworthy condition of the vessel * * * by equipping [her] with a short hatch board * * *," it is entitled "to only fifty (50%) per cent indemnity from" Houston Stevedore, and Port Arthur Stevedore "* * * in equal amounts of twenty-five (25%) per cent each, based on their equal failure to perform * * * [the] stevedoring work in a safe and workmanlike manner * * *." Time Charterer was also allowed to recover its counsel fees and expenses subsequently fixed by the Court from Shipowner and Houston Stevedore and Port Arthur Stevedore.[8]

No one is happy and all appeal.[9] Libellant seeks reversal of the 20% finding of contributory negligence. Shipowner seeks reversal as to the indemnity award against it for 50% of Time Charterer's counsel fees and to secure full, not 50% indemnity from the Stevedores and Time Charterer and to increase the finding of contributory negligence from 20% to 50%. The Stevedores seek reversal of the 50% indemnity award against them (25% each) and as to the award of counsel fees to Time Charterer. Finally, Houston Stevedore seeks reversal of denial of indemnity against Port Arthur Stevedore.

But despite all of these intervening complications, the case is simple when we return to its simplicity. The case begins

6. Warranty of Workmanlike Performance.

7. The stevedoring contracts contained this provision (letters in brackets being inserted for ease of reference) :
"It is agreed between the parties that [a] the contractor shall be in full control of those parts of the vessel and adjoining land structures and areas in which it is conducting stevedoring operations, and [b] shall be responsible for all personal injuries, including death, incurred by all persons without exception, and for damage to property, wherever such personal injuries and damage occur, if caused in whole or in part by the negligence, whether active or passive, of the contractor, and [c] the contractor does hereby indemnify and hold harmless the company and its affiliated companies against all suits, claims or demands, including court costs and counsel fees, arising therefrom."

8. In the Court's supplemental findings of fact fixing Time Charterer's fees and expenses, the Court, presumably rejecting a number of post trial petitions for rehearing which sought an express finding that Shipowner was precluded from asserting indemnity did find that Shipowner "was negligent in supplying the short hatch board * * *." Shipowner argues that with this change fell also the contention that the defect in the board was "latent."

9. To Time Charterer, happiness is an affirmance of its decree against Shipowner and Stevedores for counsel fees and a rejection by this Court of Shipowner's appeal seeking indemnity from it. This leads it to take a "protective appeal" as to the trial Court's rejection of its claim of full indemnity over against the two Stevedores.

and remains a simple one if—and, of course, the if is a big one—the incident took place as Hebert contends and there was in fact a hatch board that was too short.

The No. 1 hatch had the customary hatch beams, King and Queen, with three sections of hatch boards. Following the regular practice after the battens were removed, Hebert and several other fellow workers rolled back the tarpaulin which exposed all of the hatch boards. Apparently working in the center section first and in the center of the hatch, Hebert's fellow worker removed the first hatch board. Hebert came in from behind him to get the adjoining board and had to stand on another one. As he looked at its surface, it looked ordinary. But all of a sudden, the end of the board on which he was standing tipped upward and, so he described it, it came up "like a seesaw" and one of his legs slipped full length into the hole.

Libellant was subjected to pressing cross examination both on pretrial depositions, which were frequently quoted, and in open court. He was substantially corroborated in his explanation of the injury and the occurrence by the walking foreman of Port Arthur Stevedore. This took two turns. One was a report by him at some time to the Ship's mate as to the occurrence, and a report of the injury to his employer and the insurer under the Longshoreman and Harbor Worker's Compensation Act. More important, and more direct, was that from the walking foreman, who was standing nearby hatch 1 superintending some other rigging operation. Although he does not undertake to say that he saw Hebert in the moment of the accident, he did observe him on the hatch with one leg substantially through the open space. The walking foreman was quite positive that one of the hatch boards was too short.

Of course it was not all one way. There was, first, the predicament facing any damage claimant in walking that narrow line between a thing that is bad but not too bad as to be obvious. Libellant continues this course with some diffi-culty in his attack on the 20% reduction for contributory negligence. For he insists that the hatch boards looked to be in order and while they varied in width and length as was usual, it was not such as to be spectacular. The question then is: what caused the board to up-end or seesaw? Likewise, there is the mystery about what happened to the board. If, as the theory envisages, it was so short that it did not overlap the lip of the King beam it would seem that if it up-ended causing Hebert to fall down part way through the space, the board would have fallen into the hold, but it did not do so.

But these are the stuff of which lawsuits are made. Accidents do happen that simply cannot occur. Otis Elevator Co. v. Robinson, 5 Cir., 1961, 287 F.2d 62, 64. Ships still collide, although at the moment of impact, each is going full astern through the water.

■ Whatever our misgivings about what we would decide were that committed to us, we know that if "we were to approach it as simply a question—how should this case be decided?—we would effectually bypass a trial court." For a " * * * trial of a hotly contested, sharply disputed case is the task of a trial court. * * * [and] Whether formulated in the mold of 'clearly erroneous' or followed intuitively as a measure, reviewing courts, even in admiralty * * should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous, running advocacy." Ohio Barge Line v. Oil Transport Company, 5 Cir., 1960, 280 F.2d 448, 449. And certainly there was, below and here, advocacy of the most intense nature. Indeed, natural self-interest in fleeing before Ryan is a sharp reminder that each must fend for one's self, oblivious to the lack of any symmetry in the total picture with positions taken that are either weak or strange simply because in the exigencies of the moment, nothing else can be grasped. All the while, of course, the tribunal is left with the impression that

the system must be good for discerning the truth since there is so little logical consistency in the tactics and strategy apparently being employed. And so it is here.[10]

Under familiar principles of F.R.Civ.P. 52(a) so long "judicially engrafted onto the admiralty procedure," O/Y Finlayson-Forssa A/B v. Pan Atlantic Steamship Corporation, 5 Cir., 1958, 259 F.2d 11, 12, 13, 1958; McAllister v. United States, 1954, 348 U. S. 19, 75 S.Ct. 6, 99 L.Ed. 20, we have no doubt that our function calls for us to accept this basic finding as to the occurrence, the mechanism of it, and the resulting injury. From that point on, everything falls neatly into place.

Unseaworthiness of the vessel follows as a matter of course. Mills v. Mitsubishi, 5 Cir., 1966, 358 F.2d 609. And there is more than enough evidence for the Court to have concluded that, a hatch board being a part of the ship's regular equipment, the presence of the defective one was due to the negligence of Shipowner.

So, too, Houston Stevedore is clearly cast. For on the hypothesis of the judicially determined too-short hatch board, the Judge was certainly entitled, if not compelled, to find a WWLP breach. All must recognize that whatever was the condition on opening of the hatch at Port Arthur existed at the moment of closing in Houston. Here custom, usage, and the industry's own approach, rather than indicating a laxness as is so often so when proof of this character is offered in tort situations, see Schlichter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801, 804, 1961 AMC 1164; June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 406, 1961 AMC 1431, reflect an exacting standard of performance which becomes an adequate guide line for judicial appraisal. Both the superintending Stevedore and the president of Houston Stevedore acknowledged without reservation that a competent stevedore in the safe performance of its engagement in closing up hatches would be vigilant in determining whether the ship's hatch boards being put back in place were or had become defective. On the discovery of any such defects, such stevedore should report the deficiency to the appropriate ship's officer for necessary replacement or repair, and failing that, the necessary stoppage of work or other steps to avoid the hazards.

The hazards are well known since work, especially at succeeding ports, calls for much traffic on and over hatches. And certainly that is true in ports where, such as Houston and Port Arthur, the record shows that opening and closing hatches is considered longshoremen's, not ship's crew, work. In closing hatches, this operation includes rolling out the tarpaulins in place ready for battening down by the ship's crew. Consequently, in the absence of eagle-eye inspection at each stage of hatch closing, the ship must depend on the quality of the performance of the task by the stevedore.

The importance of hatch opening and closing is further demonstrated by the industry's acceptance of work rules requiring immediate, direct supervision of such activities by the gang foreman.[11]

10. Shipowner does not challenge now the findings of injury, unseaworthiness, and ship's negligence, but concentrates on (a) increasing the finding of contributory negligence from 20% to 50% and securing 100% indemnity, not 50%, from the two Stevedores. Houston Stevedore attacks the award to the Libellant on the ground that liability was never established, while Port Arthur Stevedore, breathing as fervently as the Libellant, flatly asserts the "evidence clearly shows that the particular hatch board in question * * * was not suitable for the purpose for which it was intended, so as to allow the Board to kick up * * * resulting in" injury to Hebert.

11. See, e.g., Rule 12 of the Marine Safety Council Safety Rules contained in the collective bargaining longshore agreement for Texas ports effective 1960:

"12. Hatch tenders or Gang foremen's responsibilities: he shall be recognized as the key man around whom the gang is formed. * * * The safety of the gang as well as the cargo is up to him.

" * * * He is required to give his personal attention to the removal of hatch

**348**

Indeed, the record reveals that in the eyes of the industry, the Federal Safety and Health Regulations for Longshoring, Title 29 C.F.R. § 1504.31, although not effective until a few months after this incident, merely codify good industry practice,[12] and as such, they are certainly of relevance here. Ray v. Compania Naviera Continental S.A., D.C.Md., 1962, 203 F.Supp. 206, 210.

Houston Stevedore can find no escape based on the assertion that as a part of the WWLP, the Stevedore had no obligation as a matter of law to discover latent defects.[13] The trial Court did not find that the too-short board was a latent defect. On the contrary, on partial rehearing, it categorically held that the Shipowner had negligently supplied a defective board—a conclusion which implies that with a reasonable amount of attention, the defect would have been discerned. And considering the distinction between the duty of the injured workman to exercise reasonable prudence for his own safety and that encompassed in the WWLP, the finding of 20% contributory negligence cuts no real figure. Nor does it succeed by the *Weyerhaeuser* contention that Shipowner's "conduct * * * [was] * * * sufficient to preclude recovery." Weyerhaeuser S.S. Co. v. Nacirema Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 49. In the final analysis, this attack comes down to nothing more than the assertion that Shipowner furnished an unseaworthy vessel by supplying a too-short

hatch board, which Stevedore had no reason to suspect was, or might be, too short. This is but a repetition of the defense so long rejected that negligence of the shipowner or unseaworthiness of the vessel by reason of the defective appliance does not of itself foreclose indemnity. Lusich v. Bloomfield S. S. Co., 5 Cir., 1966, 355 F.2d 770; T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir., 1966, 362 F.2d 745 [June 23, 1966].

Coming from the lips of two high executives who could speak authoritatively for Houston Stevedore, this record affirms the industry's awareness of the likelihood of damaged or defective hatch boards, the obvious hazards from the use of them and the practical requirement that a good stevedore in the course of safe operations would not knowingly put them back in place. The stevedore having the last operational contact with them is in a position to avoid altogether, or minimize greatly, the hazard. At least the trier of fact could so find.

■■ Although more troublesome as to Port Arthur Stevedore, the problem and result are the same as for Houston. The difficulty comes from the recognized principle, variously stated, that the WWLP does not as a matter of law require a thorough inspection of the vessel for "visual defects" or those not disclosed by a "cursory" examination, the consequence being that the *Ryan* indemnity ordinarily arises only where the stevedore had actual notice of the defect in time reasonably to take some

---

covers and beams. Hatch covers must be piled neatly against bulwark. * * * When work is stopped, the necessary beams must be shifted in place, and hatch covers put on in proper order and squarely landed."

12. 29 C.F.R. § 1504.31:
"(c) Missing, broken, split, or poorly fitting hatch covers that would jeopardize the safety of employees shall be reported at once to the officers in charge of the vessel. Pending replacement or repairs of the vessel, work shall not be performed in the section containing the unsafe covers or in adjacent sections unless the flooring is made safe.

"(d) When the hatch covers and beams are not of uniform size, they shall be placed only in the hatch, deck, and section in which they fit properly."

13. CIA Maritima Del Nervion v. James J. Flanagan Ship. Corp., 5 Cir., 1962, 308 F.2d 120; Parker v. United States, D. Ore., 1963, 223 F.Supp. 647; Ray v. Compania Naviera Continental, S.A., D.Md., 1962, 203 F.Supp. 206; Sciarrillo v. Steamship S/S Fred Christensen, S.D.N. Y., 1962, 206 F.Supp. 182; Ferrigno v. Ocean Transport Ltd., 2 Cir., 1962, 309 F. 2d 445; Pena v. A/S Dovrefjell, S.D. N.Y., 1959, 176 F.Supp. 677.

corrective steps.[14] On this premise, Port Arthur Stevedore then constructs this thesis. Considering that Hebert could not see the defect although he looked and in failing to look better the trial Court charged him with only 20% of the blame and no one at Houston was aware of it, the deficiency must have been very obscure at best. Consequently, the argument runs, it would not have been discoverable except by great vigilance than this legal standard requires and, both by its very nature and the time sequence of the interval between any assumed "cursory" discovery of it and the fall would have been too short to permit effective remedial action.

Several factors weaken considerably, if they do not completely undermine, the soundness of this structure. The first is that this is merely a rehash of the contention that the hatch board was not deficient and had not up-ended as Libellant claimed. But Port Arthur Stevedore sides with Hebert that the board was deficient. The next is that *Flanagan* states in a negative form what the law does not require *as a matter of law*. This leaves open for traditional assessment by the trier of the fact the question of *fact* as to what constitutes WLP or a breach of WWLP. Likewise, the industry has itself supplied other dramatic and positive proof of what it regards to be the acceptable standard of performance. Work rules with safety in mind require that the gang foreman give his personal attention to the removal of hatch covers and beams (see note 11, supra). And yet the Walking Foreman for the Port Arthur Stevedore acknowledged that Port Arthur Stevedore neither had nor enforced any rule requiring compliance with Rule 12 by its gang foreman and, to the contrary, this was a matter left pretty largely to the action of individual longshoremen working on, over, or around hatch openings or closings. In the face of that admission, in the light of the self-imposed standard, the expert testimony concerning hazards and steps to be taken by stevedores coming from high officials of the Houston Stevedore, the implied finding which we have credited that the nature of the deficiency was such that it ought to have been observed by Libellant and Houston Stevedore earlier, and the complete failure of Port Arthur Stevedore to show what the gang foreman had actually done on this occurrence,[15] the

14. See, e.g.:
"Courts allowing indemnity against the stevedore when a longshoreman has been injured through a defect in the ship's ladder or other similar equipment have done so, uniformly, only where the stevedore had actual notice of the hazardous situation and failed to take any steps to remedy it." CIA Maritima Del Nervion v. James J. Flanagan Ship. Corp., 5th Cir. 1962, 308 F.2d 120, 124.
"Nor can we say, as a matter of law, that failure to make a prior inspection is a breach of the standard of performance which a stevedore impliedly warrants to the shipowner." (308 F.2d at 125)
" * * * [w]e are asked to establish, as a part of the stevedore's standard of a safe and workmanlike performance, a rule of law that failure by a stevedore to make a thorough inspection of a ship for any 'visual defects' before work by his longshoremen commences, will subject him to liability for any injuries occurring to the longshoremen because of these defects. Neither prior cases nor the practicalities of the situation point to such a result." (308 F.2d at 123)
The Second Circuit has phrased it:
"We hold that an implied warranty of workmanlike performance by a stevedore does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessels being loaded or unloaded which are not obvious upon a cursory inspection." Ignatyuk v. Transp. Chartering Corp., 2 Cir., 1957, 250 F.2d 198, 201.
T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir., 1966, 362 F.2d 745 [June 23, 1966]; Moore-McCormack Lines, Inc. v. Maryland Ship Ceiling Co., 4 Cir., 1962, 311 F.2d 663; Orlando v. Prudential S.S. Corporation, 2 Cir., 1963, 313 F.2d 822; Calderola v. Cunard S.S. Co., 2 Cir., 1960, 279 F.2d 475; Ray v. Compania Naviera Continental, S.A., D.Md., 1962, 203 F. Supp. 206; Pena v. A/S Dovrefjell, S.D. N.Y., 1959, 176 F.Supp. 677; Parker v. United States, D.Ore., 1963, 223 F.Supp. 647.

15. The gang foreman was not produced as a witness. The record shows he was away squirrel hunting.

trial Court was certainly justified in drawing the conclusion as a fact (or legal fact) that this breached the WWLP.

■ The industry set the standard of vigilance. Port Arthur Stevedore made no effort to satisfy that standard. In the absence of contrary proof from those having access to knowledge of the immediate events, the Court was warranted in inferring that had this vigilance been exercised, the defect would have been revealed. On this approach the obligation of Port Arthur Stevedores to indemnify rests on what ought to have been done earlier by it, cf. T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir., 1966, 362 F.2d 745, not on any supposed existence of sufficient time between Hebert's theoretical discovery of the deficiency and the moment of the accident.[16] Likewise, this minimizes greatly, if it does not disregard altogether, Hebert's own negligence which, we now recognize, may be imputed to Port Arthur Stevedore as a factor in assaying breach of the WW LP. Lusich v. Bloomfield Steamship Co., 5 Cir., 1966, 355 F.2d 770, distinguishing Drewery v. Daspit Bros. Marine Divers, Inc., 5 Cir., 1963, 317 F.2d 425.

■ We thus affirm the substantive findings of breach of the WWLP by both Stevedores. That precipitates the question whether there was proof, finding, or both, that the conduct of Shipowner precluded indemnity and, if so, to what extent. Literally, there are no such findings. The closest the trial Court came was, first, to characterize as "negligent" the Shipowner's furnishing of the too-short board, earlier found to be an unseaworthy fitting, and, second, apportion this on a 50–25–25 basis. As to the first, this really adds nothing "to

take it out of the general rule that negligence of the shipowner is not a bar to recovery." T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir., 1966, 362 F.2d 745. And, as we have intimated above, we find nothing in the record which would compel a finding that Shipowner's negligence, the vessel's unseaworthiness, or both, were of such a character as to preclude indemnity as a matter of law. On the hypothesis, which simply has to run throughout this whole case, that the board was too short and the accident occurred substantially the way the Libellant claims it did, the Judge was entitled to infer that there was nothing about this prior negligence or unseaworthiness which would "prevent or seriously handicap the stevedore in his ability to do a workmanlike job," as the Second Circuit phrases the preclusion test, Albanese v. N. V. Nederl Amerik Stoomv Meats, etc., 2 Cir., 1965, 346 F.2d 481, 1965; Mortensen v. A/S Glittre, 2 Cir., 1965, 348 F.2d 383, 1965, or as we have expressed in several ways in Waterman S. S. Corp. v. David, 5 Cir., 1965, 353 F.2d 660.

■ As to the second—the percentage apportionment—this is a result, not a reason for, and it is precisely here where we find this device wanting in this case. We discern neither finding nor proof as to the reason why. Consequently, without undertaking to rule for all time that in the adjustment of these complex warranties and counter warranties or promises,[17] there may never be an acceptable, equitable basis for distributing the burden of a loss resulting from the operational cooperation of breaches or wrongs of several par-

16. See also Guarracino v. Luckenbach S.S. Co., 2 Cir., 1964, 333 F.2d 656; Calmar S. S. Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79; Holly v. The Manfred Stansfield, E.D.Va., 1960, 186 F.Supp. 212; Smith v. Jugoslavenska Linijska Plovidea, 4 Cir., 1960, 278 F.2d 176; Metropolitan Stevedoring Co. v. Dampskisaktieselskabet Int., 9 Cir., 1960, 274 F.2d 875.

17. See, e.g., Pettus v. Grace Line, Inc., 2 Cir., 1962, 305 F.2d 151; Waterman S.S. Corp. v. David, 5 Cir., 1965, 353 F.2d 660; DeGioia v. United States Lines Co., 2 Cir., 1962, 304 F.2d 421; Metropolitan Stevedoring Co. v. Dampskisaktieselskabet Int., 9 Cir., 1960, 274 F.2d 875.

ties,[18] we certainly see no basis for it here.

The result is that we sustain Shipowner's appeal by modifying the decree to allow 100% indemnity against each of the Stevedores to be borne by them 50–50.

█ But we think that the trial Court was clearly correct in denying Shipowner indemnity against Time Charterer. And this is so whether based on the theory of third party beneficiary to the express indemnity agreement between the Stevedores and Time Charterer (see note 7, supra) or implied as a sort of extension of the *Ryan* concept. Assuming that—and the assumption is a big one—that Shipowner can claim the benefit of Time Charterer's subsidiary contract with the Stevedore,[19] there is no finding of negligence against either one or both of the Stevedores. The Court did find breach of the WWLP, but that is a far different matter, and we are certainly not in a position to say that on principles of negligence, as such, the trial Court was compelled to make such holding as to the Stevedores. And yet the contractual indemnity requires "negligence * * * of the contractor."

█ Insofar as the Shipowner, standing on its own rights, asserts an implied warranty of the *Ryan* type, we think it fails for a number of reasons. First, there was no demise of the vessel. The Charterer had the responsibilities, but only the responsibilities, of a time charterer under a traditional time charter. The typical clause (note 5, supra) specifying that the captain shall be under the orders of the Charterers "as regards employment and agency" and that "charterers are to load, stow, and trim the cargo" does not give to Time Charterer any operational control over these activities. Rather, these charter party provisions are essentially a specification of the party—owner or charterer—upon whom the ultimate financial cost rests for any one or more of the activities.

Although, the charterer is to secure and pay for such port activities as pilotage, towage, port charges, including arrangements for loading and discharging of cargo, such activities if conducted by the ship or its crew do not become those for which the time charterer has an operational responsibility. Thus, for example, under the typical obligation to pay for port charges, pilotage, towage, etc. "the charterer is not liable for the negligence of the tugs which he has employed to dock the vessel" and as to a pilot arranged and paid for by the charterer " * * * it is the owner and not the charterer who is liable for his negligence in navigating." [20] In the absence of circumstances which would give rise to a liability for actions taken by an independent contractor [21]—none of which are present here—Time Charterer had no responsibility to Shipowner or to third persons including longshoremen for acts of omission or commission by the stevedores. There is nothing in *Ryan* —certainly not yet—by which a time charterer is held to have warranted that persons performing activities for which a time charterer has the ultimate finan-

18. Assuming, as some knowledgeable persons doubt, Gilmore & Black, Admiralty, p. 371 (1957); Grace Lines, Inc. v. Port Everglades Term. Co., 5 Cir., 1963, 324 F.2d 699, 701, that in a practical way there is any practical vitality in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, we do not think this outlaws for all time judicial improvisation in the accommodation of this dynamic Sieracki-Ryan-Yaka-Italia concept. Difficult as it conceptually is to read out handy, everyday notions of prudence, due care on the ground that tort principles as such are not pertinent, Italia Societa v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S. Ct. 748, 11 L.Ed.2d 732, the process is inevitably a comparative one (see Pettus v. Grace Line, Inc., 2 Cir., 1962, 305 F.2d 151, supra) perhaps justifying comparative techniques sometimes.

19. See Pettus v. Grace Line, Inc., 2 Cir., 1962, 305 F.2d 151; Ferrigno v. Ocean Transport Ltd., 2 Cir., 1962, 309 F.2d 445.

20. Poor, Charter Parties and Ocean Bills of Lading (4th Ed., 1954), §§ 1–16 and see especially § 7.

21. E.g., inherently dangerous operation.

cial responsibility will perform their respective engagements in a workmanlike fashion.

There was thus no basis for Shipowner to recover indemnity from Time Charterer.

 Indeed, the opposite is true which means, as contended for by the Stevedores, it is Shipowner, not Stevedores, who should bear counsel fees and expenses awarded to Time Charterer and apportioned on the 50–50 basis. As was true in the claim of Shipowner versus Time Charterer just discussed, we find no basis in the record for awarding indemnity against Stevedores based on the express contract (note 7, supra). There is no finding of negligence as such. There is at most a finding of a breach of the WWLP. Likewise, Time Charterer having no operational responsibility for the conduct of the Stevedore's work makes no implied warranty of a *Ryan* kind which either counterbalances or makes immaterial the ship's own warranty of seaworthiness. In other words, as between Time Charterer and ship, there is no place for the *Weyerhaeuser* preclusion doctrine. Here on the express findings of the trial court, Shipowner not only breached its warranty of seaworthiness contained in the charter (see note 5, supra) but it did so "negligently." Where the "owner * * * agrees to maintain his ship in a thoroughly efficient state in hull and machinery * * *" during the charter period, the " * * * charterer may have damages" for " * * * the breach of this obligation" including, as an example, specifically for the failure "to keep the winches in repair." Poor, note 20, supra.

 There remains the question of whether the two Stevedores are liable under *Ryan* to Time Charterer. That its defense was successful would not, of itself, prevent indemnity for counsel fees and expenses. Strachan Shipping Co. v.

Koninklyke, 5 Cir., 1963, 324 F.2d 746; Lusich v. Bloomfield S. S. Co., 5 Cir., 1966, 355 F.2d 770. But while the trial Court's findings of breach of the WWLP by each of the Stevedores, resting as it does upon the relationship between ship and Stevedore, would likely give Time Charterer as the immediate employer of Stevedore the full benefit of such findings, we might have difficulty in seeing how it was the breach of the WWLP which brought about these costs had Time Charterer merely been impleaded by Shipowner. But here it was by Libellant sued directly as a respondent. In that situation there seems to be no reason why Time Charterer as the immediate employer of the Stevedores should not have the benefit of the *Ryan* indemnity. Consequently, the award of 50% of such costs awarded Time Charterer against Stevedores is affirmed. So, too, is the award of 50% against Shipowner. Time Charterer does not seek other or further relief if, as we have done, we reject Shipowner's contention that Time Charterer, too, should be cast for full indemnity.

 This leaves [22] perhaps a tag end as to whether Shipowner's general attack is sufficient to encompass a contention that the 50% of Time Charterer's counsel fees assessed against it by the Court should be passed off 100% onto the Stevedores, as was done above for the indemnity generally. Clearly, as between Time Charterer and Shipowner who breached the warranty of seaworthiness owed to Time Charterer, there is no place for the *Weyerhaeuser* preclusion doctrine. To a very real extent, therefore, Shipowner has incurred a liability for this obligation not because of any failure on the part of the Stevedores, but because of the extensive contractual undertaking to Time Charterer encompassed within its warranty of seaworthiness in the charter party. To this extent

---

22. For reasons discussed at length in assaying breach of WWLP by the Stevedores, we have no warrant to alter the trial Court's 20% contributory negligence finding. All such appeals are rejected.

In like fashion we dispose of Houston Stevedore's indemnity against Port Arthur Stevedore as being without any merit.

these costs are analogous to special damages which, more remote because occasioned by a contractual undertaking, are not recoverable ordinarily against a third party. Again, without making any definitive ruling for all time, we think on this record this is a situation in which the apportionment made by the trial Court appears to be equitable and warranted. The Shipowner and the Stevedores therefore bear this 50–50 without further recourse one against the other.

As the case has to be remanded for the entry of appropriate orders after such hearings as may be necessary to fix the amount of the costs and expenses for which Shipowner is entitled to indemnity, this Court deems it preferable that this encompass as well all appropriate claims for counsel fees and expenses incident to the appeals and cross appeals and any other adjustments required by our decision.

Reversed in part, affirmed in part and as modified remanded.