**NATIONAL LABOR RELATIONS
BOARD, Appellant,**

v.

**NEUHOFF BROS., PACKERS, INC.,
Appellee.**

**No. 23330.**

United States Court of Appeals
Fifth Circuit.

March 23, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Janet A. Kohn, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, George B. Driesen, Karen W. Ferguson, Attys., N. L. R. B., Washington, D. C., for appellant.

Fritz L. Lyne, Erich F. Klein, Jr., Lyne, Klein & French, Dallas, Tex., for appellee.

Before BROWN, COLEMAN and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board petitions for enforcement of its Order holding that the Employer violated § 8(a) (1) by coercive interrogations of employees and threats during an organization campaign, coercive interrogation by counsel in preparation of the defense of the unfair labor practice charges and a § 8(a) (3) discriminatory discharge. We enforce.

As there is really not a single new legal principle involved or decided, the case requires little detail.

The Employer [1] is engaged in the production of meat products in Dallas, Texas. In February 1964 and down through the election held in September 1964 [2] the Union [3] conducted a spirited organizational campaign which could be matched only by one of like intensity by the Employer.

For our purposes of reviewing the Board's decision, the Employer's activity is of particular importance. Once the Union organizers started pamphleteering the employees at plant entrances, parking lots, etc., if not before, the Employer undertook vigorous steps to counteract the campaign. It sent not less than six letters to the employees at their homes, some of which enclosed material or made reference to events occurring elsewhere which pointedly conveyed the message that Unions were often guilty of violence, provoked unsuccessful strikes and the like. More than that, the president Henry Neuhoff, Jr. made a series of speeches to captive audiences on company time and company property. The speeches, containing not too veiled suggestions that when the Union came in, whatever the employees got would come only after hard bargaining, the message being rath-

1. Neuhoff Bros. Packers, Inc.

2. The representation proceeding is not involved directly here. The Examiner's decision reveals that the Union lost by a vote of 347 to 315, with 43 challenged ballots. The history of this litigation is recounted by this Court's earlier opinion,

Neuhoff Brothers, Packers, Inc. v. NLRB, 1966, 362 F.2d 611, cert. denied, 386 U.S. 956, 87 S.Ct. 1027, 18 L.Ed.2d 106.

3. United Packinghouse, Food and Allied Workers, AFL–CIO.

er pointed that the Employer in bargaining could hold out to the bitter end and thus frustrate the efforts at agreement, were held by the Examiner to have been coercive and in violation of § 8(a) (1). The Board did not review that factual finding as such. Rather, it held that since this was repeatedly offered by the General Counsel as hostility background material only with no formal charge as such included in the complaint, the Examiner's conclusion had to be set aside.

On the other side of the picture it was uncontradicted that the Employer, having been involved some years earlier in NLRB proceedings, with advice of competent and responsible counsel, undertook as best it could to conduct its lawful antiunion campaign, cf. NLRB v. McGahey, 5 Cir., 1956, 233 F.2d 406, in a perfectly lawful manner. This included specifically the indoctrination of the submanagerial level in those things which could and could not be discussed in the man-to-man, heart-to-heart, encounter between supervisors and workers, plus a withdrawal of pre-existing authority on the part of supervisors to discharge unfit employees on the spot.

■ Against this synoptic background, the § 8(a) (1) charges can quickly be disposed of. Once it is recognized that some words, if spoken, or if judicially declared to have been spoken, cf. D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 344, 1966 AMC 2223, carry their own death wound of forbidden discrimination, NLRB v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 90, nothing is left to the Employer's defense except the assertion that these were, at worst, isolated instances. For despite the effort of management to keep its unsophisticated advocates within the narrow lines allowed, Hendrix Mfg. Co. v. NLRB, 5 Cir., 1963, 321 F.2d 100, 104, its supervisors, whether "out of zeal, ignorance, or otherwise * * * in championing the anti-union cause," made statements, so the Board with ample basis credited, which were outright, not subtle, transgressions of § 8(a) (1). These included threats to discontinue bonuses, to fire union adherents, and persistent questioning about known union meetings leading the employees to believe that they were under surveillance and their union activities known to management.

Considering the open, vigorous, zealous, antiunion attitude and campaign of the Employer, and the position in the union campaign of at least some of the employees involved in these asserted § 8 (a) (1) incidents, we have no basis for concluding that these are isolated. Whatever vitality cases such as Quaker State Oil Refining Corp. v. NLRB, 3 Cir., 1941, 119 F.2d 631, 633; NLRB v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474, 479; NLRB v. Hart Cotton Mills, Inc., 4 Cir., 1951, 190 F.2d 964, 974, might have in the light of NLRB v. Walton Mfg. Co., 5 Cir., 1961, 286 F.2d 16, reversed, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, opinion on remand, 1963, 322 F.2d 187; NLRB v. Florida Citrus Canners Co-op., 5 Cir., 1961, 288 F.2d 630, reversed, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, opinion on remand, 1963, 311 F.2d 541, it is not for us to displace the Board's factual conclusion. Today the employer seldom engages in crude, flagrant derelictions. Nowadays it is usually a case of more subtlety, perhaps the more effective, and certainly the more likely to escape legal condemnation.

■ What we say regarding the § 8(a) (3) discharge of Franklin may likewise be severely capsulated. This is so because his supervisor Talbert, admittedly one having the status of a supervisor under the Act, 29 U.S.C.A. § 152(11), was credited with having made statements which showed at an earlier time the threat to fire anyone signing a union card and, at the time of the discharge, that the threat was made good. As in the § 8(a) (1) situations, the words spoken—if actually spoken—are enough. NLRB v. Ferguson, 5 Cir., 1958, 257 F.2d 88.

The only question, then, is whether Talbert significantly contributed to the accomplishment of the discharge and if not, whether the person effecting the

discharge was shown to have had an adequate awareness of Franklin's union loyalties and activities. See NLRB v. Fontainebleau Hotel, 5 Cir., 1962, 300 F.2d 662, 665; NLRB v. Cosco Products Co., 5 Cir., 1960, 280 F.2d 905, 909; Tampa Times Co. v. NLRB, 5 Cir., 1952, 193 F.2d 582, 583.

Of course to the Employer's insistence that the official effecting the discharge was ignorant of Franklin's union activity was added the very substantial proof showing a repetition of serious errors in the checking of customers' meat orders by Franklin which would more than justify an employer in making a discharge. As we view the case, we need not examine the relative merits of this contention if we accept both propositions that (a) the executive nominally effecting the firing knew nothing of Franklin's union activities and (b) he was motivated solely by Franklin's demonstrated incompetence. This is so because the record shows without contradiction that Talbert had a significant role in the discharge and with his "judicially determined" attitude of anti-union discrimination this significantly infected what might otherwise have been an innocent sterile act.

As indicated briefly above, in planning the campaign of opposition, management did two main things. First, it schooled its subordinate management level in what could and could not be done, could and could not be said. Second, fearing perhaps wisely that despite these managerial admonitions, legitimate disciplinary actions by those so close to the workers might be interpreted by the Labor Board as incidents of illegal antiunion discrimination, management formally withdrew the long standing power of these supervisors to discharge unsatisfactory employees on the spot. The question of what could be done with unsatisfactory employees weighed heavily on management's mind especially in the light of its prior experience.

Thus at the moment the problem about Franklin came up, the high management was engaged in a conference with its labor counsel precipitated largely because of the Union's formal demand for recognition. Someone raised the question of how far they could go in disciplining or discharging workers whose performance was unsatisfactory in view of the fine line which had to be toed. This led to a discussion of Franklin's performance and the report of a serious error made by him on the previous Friday. Talbert was called up, made his report, and was dismissed. Had it ended there, it might well have been quite a different case. But before the management decision was reached and certainly before it was communicated, either directly or indirectly to Franklin, the following took place. Talbert left the management conference about noon and returned to his regular post of work. About 3:00 o'clock he was summoned again to the office of Martin McRedmond, one of principal management. He was asked point-blank what he, Talbert, thought of Franklin and to this, Talbert replied categorically that Franklin should be discharged.[4] The discharge followed almost immediately

---

4. Talbert testified as follows:

"Q. And after, after you read the notes [about Franklin's errors], what happened?

"A. Well, I was dismissed from the room by Mr. Henry Neuhoff. He said he would let me know something and I was dismissed.

"Q. What did you do?

"A. I went back to assume my duties as Supervisor.

"Q. What was the next step that happened insofar as you were concerned with the Franklin matter?

"A. About five minutes to three on June 29, Mr. Martin McRedmond called me on the phone; I was on the back dock. He asked me to come to his office.

"I went up to his office and went in and sat down. Mr. McRedmond said to me, 'Joe, what was your appraisal on Franklin?' I said, 'I think he should be terminated.' Mr. Martin McRedmond said, 'Go ahead and get his check.'"

and through the instrumentality of Talbert.[5]

The record, therefore, reveals not only an adequate basis for an inference of discriminatory motive, but uncontradicted proof that the immediate supervisor having the role of management who had earlier threatened discharge of any employee holding a union card was here a key man in management's decision to discharge. Not only was it a matter of tying the past, the threatened future into the decisive present, this very person (Talbert) is credited by the Board with having said just an hour before that he, Talbert, was "going to fire you," Franklin, because he had signed a union card.[6]

When a sub-level manager holding and expressing the antiunion bias credited to him by the Board is involved directly in the decision whether to discharge an employee, the Board is entitled to conclude that this was a case of the threat made good. Under these circumstances management cannot ignore the significance of such opportunity to carry out the discriminatory threats, or retreat to the innocence—no matter how genuine it might have been—of its nominal actor or spokesman. Management must obviously bear the consequences of the unwarranted zeal of its subordinate superiors, Hendrix Mfg. Co. v. NLRB, 5 Cir., 1963, 321 F.2d 100 at 104, and certainly so when under a newly announced policy of withdrawing discharge authority, the highest management suddenly revives the authority for what it must have thought was a significant, if not decisive, recommendation. Cf. 29 U.S.C.A. § 152 (11); NLRB v. Southern Airways Co., 5 Cir., 1961, 290 F.2d 519, 524; NLRB v. Economy Furniture, 5 Cir., 1960, 284 F.2d 339. Those in active management having an active voice in the discharge of Franklin knew of Franklin's active work in behalf of the Union's campaign. That, in the setting of this record, was ample to justify the inference of a § 8(a) (3) antiunion discriminatory discharge.[7] NLRB v. Laney & Duke Storage Warehouse Co., 5 Cir., 1966, 369 F.2d 859 [Dec. 6, 1966].

We think the Board was likewise authorized to find that the actions of the Employer's counsel in investigating the unfair labor practice charges violated § 8(a)(1).

5. Shortly after their conversation, Talbert, accompanied by McRedmond, met Franklin. Franklin testified:

"Joe Talbert said, 'You made a mistake Friday,' and I said, 'Yes, I did.' He said, 'We can't use a man around here who makes mistakes.' Mr. Martin McRedmond said, 'The mistake that you caused could have cost us $600.00.' I said, 'But it didn't.' So, Joe Talbert said, 'We just can't use you no more.' So, he reached in his pocket and gave me my check and I asked him, I said, 'Is it marked up to date?' He said, 'It is up to date.'"

6. About 2:00 p. m. that same afternoon, Talbert encountered Franklin in a working area and in effect asked Franklin whether he had attended a meeting the day before. Franklin admitted that he had and in response to further inquiry acknowledged that it was a Union committee meeting. Talbert then asked Franklin whether he had signed a union card. When Franklin admitted that he had, Talbert replied, "We can't use a fellow like you around here, Franklin."

Franklin said, "What do you mean, Joe?" To this Talbert responded, "I am going to fire you."

The Board, having credited this statement, was entitled to draw inferences contrary to those suggested by the guarded, nondiscriminatory reason formally given at the moment of discharge (note 5, supra).

7. This conclusion gains added justification from other facts, most of which are uncontradicted. Although Franklin made at least five mistakes all of which were carefully documented by written reports between the date he received the merit raise and his discharge, no such written record was maintained by management as to other checkers. Additionally, with no proof of a prior record of poor performance, or, for that matter, any history of specific pre-raise mistakes by Franklin, the Examiner was entitled to look with a jaundiced eye on the story that the April raise was given to boost Franklin's morale and help him overcome his tendency toward errors.

There were three such interviews at the Employer's plant conducted by Employer's counsel in the presence of a court reporter. In all three management officials were in attendance. In one the apparent purpose of the meeting was to receive the discharged employee's application for reinstatement.[8] In none was the interviewee advised of his right to remain silent. On two of the occasions the interviewee was not advised of the purpose of the interview,[9] and in the third where the purpose was stated, the employee made a statement which contradicted his later Board testimony because, he later testified, of the fear of reprisals from the presence of the company supervisor.[10]

■■ Of course this problem is seldom an easy one to Courts made up of Judges who are former practitioners at the Bar. On the one hand, there is the legitimate right of a party in anticipation of the forthcoming quasi-judicial proceeding to prepare for the employer's defense to the unfair labor practice charges. On the other hand, there is implicit in the rights enumerated in § 7 of the Act, 29 U.S.C.A. § 157, "the right of rank-and-file employees to a congressionally provided, effective administrative process * * *." Oil City Brass Works v. NLRB, 5 Cir., 1966, 357 F.2d 466 at 471. Consequently, the process of investigation through interrogation of employees must be a carefully conducted one lest that very activity—or the prospect of it—inhibit employees from invoking, assisting or participating in Board procedures which depend so directly upon information supplied by or through employees. There is, therefore, "* * * a delicate balance between the legitimate interest of the employer in preparing its case for trial, and the interest of the employee in being free from unwarranted interrogation * * *," for "* * * any interrogation by the employer relating to union matters presents an ever present danger of coercing employees in violation of their § 7 rights." Texas Industries, Inc. v. NLRB, 5 Cir., 1964, 336 F.2d 128, 133. Discovery, whether of the court-type, cf. Mitchell v. Johnson, 5 Cir., 1960, 274 F.2d 394; Wirtz v. Hooper-Holmes Bureau, Inc., 5 Cir., 1964, 327 F.2d 939; Wirtz v. Continental Finance & Loan Co., 5 Cir., 1964, 326 F.2d 561; Wirtz v. McDade, 5 Cir., 1964, 330 F.2d 610; Wirtz v. Robinson & Stephens, Inc., 5 Cir., 1966, 368 F.2d 114, or as a matter of self-help investigation, must avoid those coercive tendencies which it is the very purpose of the Act to prohibit. See NLRB v. Lindsay Newspapers, Inc., 5 Cir., 1963, 315 F.2d 709, 711; NLRB v. Guild Industries Mfg. Co., 5 Cir., 1963, 321 F.2d 108, 111; Surprenant Mfg. Co. v. NLRB, 6 Cir., 1965, 341 F.2d 756, 762–63; NLRB v. Winn-Dixie Stores, Inc., 6 Cir., 1965, 341 F.2d 750, 752–753, cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74. There is also the narrow line between protected lawyer activities and "persuader" activities, Wirtz v. Fowler, 5 Cir., 1966, 372 F.2d 315 [Oct. 19, 1966].

■ Of course not all penetrating interrogation is coercive and although the initial determination is for the Board, Bokat v. Tidewater Equip. Co., 5 Cir., 1966, 363 F.2d 667, 671, the Courts are available to secure to the parties and their counsel the full range of legitimate

8. In the complaint the earlier discharge of employee Willie was alleged to have been a § 8(a)(3) violation. The Examiner rejected this claim. Willie had been invited to submit application for reinstatement.

9. Employee King was interviewed in the presence of his supervisor, Conaway. The interrogation related to King's knowledge of the events surrounding Conaway's firing of Willie, purportedly because the latter had admitted that he had signed a union card.

10. Conaway was again present during the interrogation of employee Lewis. Responding to the question whether he had heard any supervisors threaten the removal of benefits should unionization be accomplished, Lewis stated merely that, "Well, right now I couldn't say." The Board could properly infer that his reticence was induced by fear of reprisals.

**378**

prehearing investigation, NLRB v. Ambox, Inc., 5 Cir., 1966, 357 F.2d 138, 141.

 In the setting of this case, the command performances of employees or former employees to come to company offices for an unannounced purpose, the presence of management representatives including on at least one occasion the supervisor alleged to have made the coercive threats, in the general atmosphere of strong intense feelings, authorized the Board to apply the approach of Johnnie's Poultry Co., 146 N.L.R.B. 770. Under it the employer is required to "* * * communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis * * *," 146 N.L.R.B. 770, 775. Contrary to the Employer's view here, we do not regard the reversal by the 8th Circuit to be a repudiation of this principle as such. Johnnie's Poultry Co. v. NLRB, NLRB v. Johnnie's Poultry Co., 8 Cir., 1965, 344 F.2d 617.[11] Without suggesting that this must be done as a red letter rubric, these actions are reasonable, easy to meet, and in no way obstructive of a full and searching investigation.

Order enforced.

---

11. The full import of the Board's reasoning should be viewed in context:
"In allowing an employer the privilege of ascertaining the necessary facts from employees * * *, the Board and courts have established specific safeguards designed to minimize the coercive impact of such employer interrogation. Thus, the employer must communicate to the employee, the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature; and the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee's subjective state of mind, or otherwise interfering with the statutory rights of employees."
146 NLRB at 775.
The 8th Circuit did not question the principles thus enunciated. Rather, after examining the entire record in the light of Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the Court accepted the Examiner's views that "the interviews were confined to matters within the scope of the amended charge and the complaint and were *neither illegal nor coercive.*" (Emphasis added.) 344 F.2d at 619. Contrary to *Johnnie's Poultry*, we find the Board's determination of coercive interrogation here clearly supported by substantial evidence on the record as a whole.